**Salem**

RICHARD E. WELSH

v.

COMMONWEALTH OF VIRGINIA

No. 1407-90-3

Decided April 7, 1992

302

COUNSEL

Gerald T. Zerkin (Kelley H. Brandt, Robert Godfrey; Gerald T. Zerkin & Assoc., on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General; Margaret Ann Walker, Assistant Attorney General, on brief), for appellee.

OPINION

**COLEMAN, J.**—Richard E. Welsh entered a conditional guilty plea to one felony count for selling unregistered securities with intent to defraud the purchaser in violation of Code § 13.1-520(A), one misdemeanor count for transacting business as an unregistered agent in violation of Code § 13.1-520(B), and two misdemeanor counts for unlawfully selling securities in violation of Code § 13.1-520(B). Pursuant to a plea agreement, Welsh reserved the right to appeal the trial court's denial of certain pretrial motions. He contends that the trial court erred (1) in denying his motion to dismiss the indictments or, alternatively, in failing to suppress evidence, because the Commonwealth did not demonstrate that the evidence it intended to use against him was not derived from testimony he gave under a federal grant of immunity; (2) in denying his motion for the judge to recuse himself based on the appearance of bias; and (3) in not dismissing the indictments because the charged statutes are unconstitutionally vague and, as applied to him, violate due process. Welsh's contentions are without merit; thus, we affirm his conviction.

The National Caucus of Labor Committees (NCLC) is an organization founded by Lyndon H. LaRouche, Jr. Richard E. Welsh is a member of NCLC and, from the late 1970's until he pled guilty, he worked as an accountant overseeing the accounting functions and financial activities of NCLC and other corporate entities associated with it, including Publication & General Man-

agement, Inc. (PGM). From 1984 until February 17, 1987, when Welsh was indicted, NCLC's corporate entities operated with large financial deficits. In order to offset these deficits, the corporations solicited and obtained loans from individuals across the nation. The loans were evidenced by promissory notes and letters of indebtedness issued by the corporations. In soliciting the loans, lenders were misinformed by the agents about the financial condition of NCLC. Richard Welsh, as corporate secretary of PGM, signed many of the promissory notes and letters of indebtedness on behalf of the corporation. Since promissory notes are securities within the meaning of Code § 13.1-501, Welsh was prosecuted for selling unregistered securities and for transacting a securities business without being registered with the Virginia State Corporation Commission.

In order to address Welsh's assignments of error, particularly the claim that Virginia is barred from prosecuting him because it used his immunized testimony to do so, it is essential to consider the related investigations conducted by the federal and other state governments. In 1986, federal authorities and prosecutors from New York and Virginia began investigating the fund-raising activities of individuals and corporate entities associated with Lyndon LaRouche. These investigative efforts culminated in federal and state search warrants being executed on NCLC offices in Leesburg, Virginia on October 6 and 7, 1986. The federal and state authorities seized a large number of documents, most of which were stored at a warehouse in Springfield, Virginia. They examined the seized documents to identify those which might be used in various grand jury investigations and in subsequent prosecutions.

On February 17, 1987, a Loudoun County grand jury indicted Richard E. Welsh on four felony counts of violating the Virginia Securities Act, Code § 13.1-501 *et seq.*, by selling unregistered securities with intent to defraud purchasers.

Sometime during the late spring or early summer of 1987, Assistant United States Attorney Kent Robinson, the lead prosecutor in the Alexandria federal investigation of LaRouche's fund-raising activities, contacted Virginia's Assistant Attorney General John Russell, who was in charge of the Virginia investigation and prosecutions. Robinson informed Russell that he intended to call Welsh to testify before the Alexandria federal grand jury under

an order granting Welsh immunity pursuant to 18 U.S.C. §§ 6001 *et seq.*[1] Russell told Robinson that this would present no problem for the Virginia prosecutions, provided that a policy of no access to the federal grand jury material was maintained by the federal and Virginia authorities.

On July 22, 1987, Welsh made the first of several appearances before the Alexandria grand jury and testified under a federal grant of immunity. He further testified before the federal grand jury in Alexandria at various times in 1987 and 1988.

In addition to the Alexandria federal grand jury investigation, a federal grand jury in Boston, Massachusetts indicted several LaRouche fund-raisers. A trial on those indictments began in December 1987. Assistant United States Attorney John Markham was the lead prosecutor in the Boston trial; he was assisted by Assistant United States Attorney Mark Rasch. Markham called Richard Welsh as a prosecution witness in the Boston prosecution. When Virginia Assistant Attorney General John Russell learned of Markham's intentions, he contacted Markham in January 1988 to remind him that Welsh was under indictment and was to be tried in Virginia. Russell informed Markham that Virginia authorities could not be exposed to Welsh's immunized testimony in Boston without tainting the Virginia prosecutions. In February and March of 1988, Richard Welsh testified in the federal prosecutions in Boston, again under a federal order granting him immunity.

The Alexandria federal grand jury investigation culminated in numerous indictments and a trial. Once more, Richard Welsh was called as a federal witness, and in November and December of 1988, he testified at the Alexandria trial under an order granting him immunity.

In January 1989, the first Virginia prosecution of a LaRouche "fund-raiser," Rochelle Ascher, took place in Loudoun County. Assistant Attorneys General John Russell and George Chabalewski were the prosecutors. Welsh did not testify in that proceeding.

---

[1] 18 U.S.C. §§ 6001 *et seq.* provide that the federal government may override an individual's assertion of his fifth amendment privilege against self-incrimination and compel the person to testify, provided that "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or information) may be used against the witness in any criminal case." 18 U.S.C. § 6002.

Nothing in the record indicates that in Ascher's prosecution Russell or Chabalewski were exposed to Welsh's immunized testimony or any evidence derived from his testimony.

Contemporaneous with the federal and Virginia investigations and prosecutions, New York authorities were investigating several individuals for their roles in the LaRouche fund-raising activities. Initially, New York Assistant Attorney General Kathryn Law was in charge of the New York investigations and prosecutions, but she left the New York Attorney General's office in July 1988. Her assistant, New York Assistant Attorney General Dawn Cardi, became the lead prosecutor. She was assisted by Assistant Attorney General Rebecca Mullane. Cardi and Mullane had contact with federal and Virginia authorities in preparing the New York cases for trial. They had access to Welsh's immunized testimony in their investigation. They did not, however, call Welsh as a witness during the New York trial, which lasted from April until August 1989. The New York prosecutors and investigators did not discuss with Virginia authorities Welsh's testimony or anything they had learned from his testimony because they were aware that Welsh was under indictment in Virginia.

In September 1989, the second Virginia prosecution of a LaRouche fund-raiser, Michael Billington, began. Again, Assistant Attorney General John Russell was the lead prosecutor. He was assisted by Assistant Attorney General Barbara Gaden. Although Welsh did not testify in Billington's case, Billington sought to have him subpoenaed as a witness. During a motion concerning whether Welsh would be subpoenaed, the trial judge and defense counsel discussed the evidence Welsh could present based on his immunized federal Alexandria trial testimony. Russell and Gaden were privy to those discussions. Russell was the lead prosecutor in Welsh's case, which led to this appeal. Gaden, insofar as the record shows, has played no part in the prosecution of Welsh.

Welsh's trial on the Virginia charges was scheduled to begin on April 14, 1990. Prior to trial, Welsh moved to have the court dismiss the indictments against him or to suppress evidence. He argued that the Commonwealth had used and proposed to use his immunized testimony to prosecute him in violation of his fifth amendment right not to be compelled to incriminate himself. Welsh contends that the use of his immunized testimony violated the fifth amendment safeguards announced by the United States

Supreme Court in *Kastigar v. United States*, 406 U.S. 441 (1972). He requested a *Kastigar* hearing pre-trial to compel the Commonwealth to show that his fifth amendment protection against self-incrimination had not been violated. He also moved that the trial judge disclose any extrajudicial sources of information he had received about the case or, in the alternative, that the trial judge recuse himself due to his extrajudicial comments and communications with others that purportedly showed bias by the judge against Lyndon LaRouche's political organization.

Following a hearing on April 12, 1990, the trial judge denied the recusal motion. The evidentiary hearing on the *Kastigar* issue began on April 24, 1990. After a hearing lasting several days, the trial court concluded that the Commonwealth had met its *Kastigar* burden by showing sources for its evidence independent of Welsh's immunized testimony and denied the motion to dismiss the indictment or to suppress any of the proposed evidence.

Welsh entered a conditional guilty plea to one felony and three misdemeanor counts of violating the Virginia Securities Act. He reserved the right to appeal the trial court's denial of the pre-trial *Kastigar* motion, the motion to recuse, and motions to dismiss the indictments on due process and *ex post facto* grounds. The plea agreement provided for additional evidentiary hearings on a motion to dismiss for alleged selective and vindictive prosecution and outrageous government misconduct. The trial court denied these motions and denied a renewed motion for recusal. Pursuant to the plea agreement, the trial judge sentenced Welsh to seven years imprisonment on the felony conviction, with execution suspended for ten years, twelve months in jail for each of the misdemeanor convictions, to be served concurrently and to be suspended after he served seventy-five days in jail upon the condition that he perform 250 hours of community service, and three years probation with special probation conditions.

## I. *Kastigar* Hearing

Welsh contends that the Commonwealth failed to meet its *Kastigar* burden of showing that his immunized testimony was not used to indict and prosecute him and, thus, his fifth amendment privilege against self-incrimination has been violated. The trial court's finding that the Commonwealth met its *Kastigar* burden is supported by the evidence and is not plainly wrong. Thus, we re-

ject Welsh's contention.

 A person who invokes his fifth amendment protection against self-incrimination is not necessarily insulated from being compelled to testify. To the contrary, pursuant to 18 U.S.C. §§ 6001 *et seq.*, a person may be ordered to testify, even though he or she asserts the protection of the fifth amendment. Furthermore, one who is compelled to testify under an order granting immunity may be subsequently prosecuted, consonant with the fifth amendment. *Kastigar*, 406 U.S. at 453. However, pursuant to 18 U.S.C. § 6002, compelled testimony cannot be used, directly or indirectly, against the individual testifying under a grant of immunity. The reason underlying the established rule that a person may be compelled to testify without violating the fifth amendment protection is that the fifth amendment does not erect a bar to prosecution; it only protects one from being compelled to produce incriminating testimonial evidence. *Id.* Consequently, where a sovereign grants immunity, the federal constitutional protection has not been violated. *Id.* The federal immunity statutes pass constitutional muster because the protection offered by these statutes is "coextensive with the scope of the privilege against self-incrimination." *Id.*

 The fifth amendment protection against self-incrimination is not rendered an empty shell when the state compels a person to testify by granting immunity. When a sovereign prosecutes an individual who has been compelled to testify under a grant of immunity, it bears a "heavy burden" to show "an independent, legitimate source for the disputed evidence." *United States v. Jones*, 542 F.2d 186, 199 (4th Cir.), *cert. denied*, 426 U.S. 922 (1976) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 (1964)). This burden "is not limited to a negation of taint; rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Jones*, 542 F.2d at 199 (quoting *Kastigar*, 406 U.S. at 460). The government is not required, however, to negate all theoretical "possibility" of taint and "need only show by a preponderance of the evidence" that its evidence is derived from an independent, legitimate source. *United States v. Dynalectric Co.*, 859 F.2d 1559, 1578 (11th Cir. 1988), *cert. denied*, 490 U.S. 1006 (1989); *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985). *See also United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990), *cert.*

*denied,* 500 U.S. 941 (1991). The government is generally required to meet its burden by presenting evidence in what has commonly become known as a *Kastigar* hearing, which hearings may be held either before, during, or after trial. *Jones,* 542 F.2d at 198. The factual findings of the trial court from *Kastigar* hearings may not be disturbed on appeal if they are supported by credible evidence, only "if clearly erroneous." *Id.* at 199 (under federal standard of review *may* be disturbed). *See also North,* 910 F.2d at 855.

In Welsh's prosecution, the trial court, after an evidentiary *Kastigar* hearing consuming several days, found that the Commonwealth had shown by a preponderance of the evidence that it had legitimate sources for the evidence it proposed to use against him. The trial court then convened a second *Kastigar* hearing after the United States Court of Appeals, D.C. Circuit, issued its opinion in the *North* case. Following a second hearing on the *Kastigar* motion, the court affirmed its earlier finding and held that the Commonwealth had met its burden of "showing that it had an independent source for the evidence used in preparing the prosecution of Welsh and to be used at trial." Unless this finding is clearly erroneous and not supported by the evidence, we cannot disturb it on appeal.

### A. *Insulated Testimony — "Chinese Wall"*

At the pre-trial *Kastigar* hearing, the Commonwealth presented evidence that it had erected a "Chinese wall" between the Virginia investigators and prosecutors and those state and federal authorities with access to Welsh's immunized testimony. When Assistant United States Attorney Kent Robinson, the lead federal prosecutor in the Alexandria prosecution, first broached the subject of federal immunity for Welsh with Assistant Attorney General John Russell, the lead prosecutor in Virginia, Russell made it clear that Virginia authorities were not to be exposed to Welsh's immunized testimony. The same understanding was reached between Russell and Assistant United States Attorney John Markham, who headed the federal prosecution in Boston. The New York prosecutors, Dawn Cardi and Rebecca Mullane, were also aware that Virginia authorities were not to be exposed to Welsh's immunized testimony. While both federal and New York state prosecutors with access to and knowledge of the substance of Welsh's immunized testimony had contact with Virginia prosecutors and investigators, they all testified that they never discussed

or made known in any way to Virginia authorities Welsh's testimony. Furthermore, the Virginia investigators who were working on the case were explicitly instructed to avoid exposure to Welsh's testimony. In fact, Assistant Attorney General George Chabalewski, who assisted in prosecuting the Ascher case, wrote to Loudoun County Deputy Don Moore, who served as a special federal marshal for the Boston and Alexandria prosecutions, to the federal prosecutors, and to Moore's employer, informing them that Moore should not be exposed to the immunized testimony that Welsh gave in Boston. Assistant Attorney General Russell also telephoned Assistant United States Attorney Robinson requesting that Moore not be exposed to Welsh's immunized testimony at the Alexandria trial.

Virginia State Police Special Agent Charles Bryant worked alongside federal agents, who had access to Welsh's immunized testimony, in the Springfield warehouse where the documents seized from Leesburg, Virginia were stored. However, the evidence established that those federal agents knew the policy that the Virginia authorities were not to be exposed to Welsh's immunized testimony and ceased any conversations relating to Richard Welsh whenever Bryant entered the room or was near them. Moreover, according to the evidence, Don Moore went so far as to leave Boston when Welsh testified under the grant of immunity. Finally, all the prosecutors and agents for the Commonwealth testified that they had no knowledge of the substance of Welsh's immunized testimony.

The Virginia prosecutors and investigators employed similar procedures, according to the testimony, with regard to the documentary evidence to ensure lack of exposure to documents used in the federal grand jury proceedings. Federal grand jury documents were segregated and were not accessible to Virginia agents. Although documents which had been identified as significant by either state or federal agents were stored together in what was referred to as the "goody box," those documents actually used in grand jury proceedings were photocopied and stored in a separate filing cabinet. The originals were returned to the "goody box" and were not labeled or identified in any way as having been used in the grand jury process. Thus, the documents identified through the independent investigations could not have been identified as significant in the grand jury proceeding in which Welsh testified.

## B. *Independent Sources*

In addition to the foregoing safeguards which the Commonwealth took to insulate itself from Welsh's immunized testimony, the Commonwealth also made a showing that it had independent sources for the evidence it proposed to use against Welsh. Welsh was indicted in Loudoun County, Virginia on February 17, 1987, at least five months *before* he first gave immunized testimony to the Alexandria grand jury on July 22, 1987. Thus, nothing he said in his immunized testimony could have influenced the Virginia authorities in their decision to indict him. Moreover, by the time Welsh was indicted, the prosecution case file, consisting of all documents authored by or addressed to Welsh, and those that referred to him, was ninety to ninety-five percent complete. On the date Welsh was indicted, the review of the documents seized from Leesburg was largely complete. Thereafter, very few documents were added to the small group of significant documents. When the Commonwealth learned that Welsh was going to testify at the prosecutions in Boston, the entire Welsh file was date stamped February 4, 1988, to show which documents were in the file as of that date. Further, each document that had potential use at trial was tracked with a document control sheet attached to it. This sheet included the name of the agent who had identified the document as significant and the date on which such identification was made. For example, a significant number of the documents used in the prosecution of Welsh had document control sheets attached that showed that they had been identified by John Parthum, an agent of the Virginia State Corporation Commission, in January and February 1987, prior to Welsh's giving of his immunized testimony.

The Commonwealth also showed that the witnesses it intended to call were known to the Commonwealth at the time Welsh was indicted and before he testified. The list of lender witnesses was compiled by state authorities based on their analyses of loan records which were reviewed shortly after the records were seized in 1986. The two chief inside witnesses from the LaRouche organization, Wayne Hintz and Chris Curtis, were known to the Commonwealth and had been extensively interviewed by Virginia investigators Don Moore and Charles Bryant by March 1987. Thus, the Commonwealth had knowledge of the substance of their testimony at least four months before Welsh first testified under a

grant of immunity.

## C. *Specific Instances of Alleged Taint*

Welsh cites several specific instances that he contends show that the Commonwealth failed to meet its *Kastigar* burden. Specifically, he contends: (1) Virginia investigator Charles Bryant had extensive contact with the federal agents who had access to Welsh's immunized testimony while Bryant was engaged in the document selection process at the Springfield warehouse; (2) LaRouche operatives, Chris Curtis and Wayne Hintz, were interviewed in the presence of Virginia prosecutors and agents by federal agents and prosecutors from New York who had had access to Welsh's immunized testimony; (3) Virginia investigator Bryant selected lender witnesses to be used in Welsh's prosecution based on reports compiled by federal agents who had been exposed to Welsh's testimony and which reports summarized the interviews with them; (4) Assistant Attorneys General Russell and Chabalewski attended portions of the opening statements in the Boston trial and may have been influenced in trial strategy or exposed to evidence derived from Welsh's immunized testimony; (5) Russell and Chabalewski read media accounts of the Boston and Alexandria trials at which Welsh testified; (6) Russell and Chabalewski had extensive contact with Dawn Cardi and Rebecca Mullane, the New York prosecutors who had access to Welsh's immunized testimony; (7) Russell read the Alexandria indictment, which was based in part on Welsh's immunized testimony; (8) Karen Koch, a legal assistant for the Commonwealth with the Attorney General's office, heard a portion of Welsh's immunized testimony at the Alexandria federal prosecution; (9) the Commonwealth obtained copies of all the Alexandria federal trial transcripts, including those of Welsh's immunized testimony; (10) just before the trial of Michael Billington, Billington moved to call Welsh as a defense witness and supported the motion to call Welsh with a *pro se* submission that summarized portions of Welsh's testimony, which summary was read by Russell; (11) at a hearing on Billington's motion to subpoena Welsh, at which Russell and Barbara Gaden were present, the trial judge referred specifically to portions of Welsh's immunized testimony.

While each of these occurrences creates an abstract possibility of taint, the Commonwealth is not required to negate every abstract possibility of taint. *Byrd*, 765 F.2d at 1529. The Common-

wealth has the burden of proving by a preponderance of the evidence that it did not use Welsh's immunized testimony to prosecute him and that it had used independent sources to do so. *Id.*; *North*, 910 F.2d at 854. So long as the Commonwealth proves by a preponderance of the evidence that the evidence it proposes to use is derived from sources wholly independent of the immunized testimony, it has met its *Kastigar* burden. Here, the trial court concluded that, notwithstanding the potentially prejudicial occurrences cited by Welsh, the Commonwealth met its *Kastigar* burden. This finding is supported by the evidence.

As to Agent Bryant's contact with federal agents, the Commonwealth produced evidence that ninety to ninety-five percent of the documentary evidence to be used against Welsh was in hand at the time of his indictment, which was before Welsh had given immunized testimony. The Commonwealth also proved that the federal agents took substantial precautions to prevent Bryant from being privy to their discussions concerning Welsh.

With regard to Hintz and Curtis, the Commonwealth established that those two witnesses had been interviewed extensively prior to Welsh's immunized testimony. Moreover, unlike the witnesses in the *North* case who had read transcripts of Oliver North's immunized testimony to refresh their recollections for trial, Hintz and Curtis were not directly exposed to Welsh's immunized testimony. Thus, their testimony was not shown to have been tainted by Welsh's immunized testimony.

The lender witnesses were identified from sources independent of Welsh's testimony — state authorities' analyses of loan records seized in the 1986 search of NCLC in Leesburg — and were known to the Commonwealth before Welsh was indicted or testified.

Assistant Attorney General Russell attended only a brief portion of the opening statements in the Boston trial, and although Chabalewski attended the entire opening statements, Chabalewski testified that he did not learn any facts from them. Furthermore, even though Russell and Chabalewski read media accounts of the Boston and Alexandria trials, the Commonwealth presented evidence to show that those news accounts had been screened previously to ensure that the articles did not recount Welsh's testimony or concern him.

Additionally, although Virginia prosecutors had extensive con-tact with the New York prosecutors Dawn Cardi and Rebecca Mullane, both Cardi and Mullane testified that they were aware that Virginia authorities were not to be exposed to Welsh's testi-mony and that they, in fact, never discussed Welsh with anyone associated with the Virginia prosecution.

Although Russell read the Alexandria indictment, without hav-ing knowledge of Welsh's testimony, he could not have ascer-tained that portions of the indictment were attributable to Welsh. Moreover, many portions of the indictment that Welsh attempts to attribute to his immunized testimony are not solely attributable to him but to other witnesses who testified about the same events about which Welsh testified.

Karen Koch, the legal assistant from the Attorney General's of-fice, was exposed to Welsh's federal trial testimony in Alexandria. She testified in the *Kastigar* hearing, however, that she attended only about fifteen minutes of Welsh's Alexandria trial testimony, that she left as soon as she was informed by Assistant United States Attorney Robinson that she should not be present, that she "memorialized" the portions of Welsh's testimony that she heard, pursuant to the instruction of Assistant Attorney General Chabalewski, and that she did not discuss Welsh's testimony with anyone. The memorandum which she prepared revealed that she recalled nothing of the substance of Welsh's testimony.

The Commonwealth, in fact, received transcripts of all the Alexandria prosecutions, which included Welsh's immunized testi-mony. However, the Commonwealth presented evidence in the *Kastigar* hearing that the Commonwealth's agents did not read Welsh's testimony. Karen Koch testified that she removed the transcripts of Welsh's testimony and, without reading them, sealed them in a manila envelope and initialed over the seal so that she could tell if the envelope had been opened. She further testified that, as of the *Kastigar* hearing, the seal appeared not to have been broken.

Assistant Attorney General Russell acknowledged that he read a summary of what was purported to be portions of Welsh's im-munized testimony in the Alexandria prosecutions. Billington sub-mitted the summaries to the trial judge in support of his motion to call Welsh as a witness. Russell stated that he did not know the

source of this information and, thus, did not know that this summary was, in fact, based on Welsh's testimony. Moreover, the summary submitted by Billington contained material that purported to be exculpatory that the government did not use and for which the government would have had no reason to use in the prosecution of Welsh. Although the trial judge had characterized Welsh's Alexandria testimony as harmful to Billington and noted some of the topics with which it dealt to substantiate his characterization, he did not detail the substance of Welsh's testimony. Assistant Attorney General Barbara Gaden, who was present at the hearing on Billington's motion, played no role in preparing the prosecution of Welsh. Her involvement in the Virginia prosecutions was limited to the Billington case. Finally, Assistant Attorney General Russell testified that neither Billington's *pro se* submission nor the trial judge's discussion of Welsh's testimony focused, affected, or influenced his preparation or investigation of the Welsh case.

Accordingly, because the trial court's finding that the government met its *Kastigar* burden is supported by the evidence and is not clearly erroneous, we uphold the finding of the trial court.

## II. Recusal

Welsh contends that the trial judge erred by denying a motion to have him recuse himself based upon the fact that from Welsh's perspective and the public's, the trial judge appeared to be biased. We find no substantial appearance of bias. Furthermore, we find no evidence to support Welsh's allegation of bias in the trial judge's rulings, findings, remarks, or demeanor at trial.

As a constitutional matter, due process considerations mandate recusal only where the judge has "a direct, personal, substantial, pecuniary interest" in the outcome of a case. *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). While bias may be so pervasive as to offend due process, "only in the most extreme of cases would disqualification on this basis be constitutionally required." *Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 678 (4th Cir. 1989) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). In fact, "matters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion." *Aetna Life Ins. Co.*, 475

U.S. at 820 (quoting *Tumey*, 273 U.S. at 523). In Virginia, whether a trial judge should recuse himself or herself is measured by whether he or she harbors "such bias or prejudice as would deny the defendant a fair trial," *Justus v. Commonwealth*, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981), *cert. denied*, 455 U.S. 983 (1982), and is a matter left to the reasonable discretion of the trial court. *Id.*; *Terrell v. Commonwealth*, 12 Va. App. 285, 293, 403 S.E.2d 387, 391 (1991).

Welsh argues that the trial judge appeared to be biased because of his connections with, correspondence received from, and correspondence sent to members of the Anti-Defamation League of B'nai B'rith (ADL). He identifies, however, no "direct, personal, substantial [or] pecuniary interest" that the trial judge had in the outcome of Welsh's case. *Ward*, 409 U.S. at 60. Consequently, no due process considerations have been implicated. Therefore, the trial judge's denial of Welsh's recusal motion may not be reversed on appeal unless he abused his discretion in denying the motion.

Welsh points to the fact that the trial judge revealed at an April 12, 1990 hearing on Welsh's recusal motion and at a subsequent hearing that he had had correspondence with members of ADL about the LaRouche organization. At the hearing on the recusal motion, the trial judge disclosed that he had received a letter dated April 2, 1990, from Ira Gissen, the regional director of ADL. This letter contained four ADL publications that were critical of the LaRouche organizations, as well as an ADL resolution calling for the appointment of a Jewish justice to the Virginia Supreme Court or Court of Appeals. Gissen's letter stated that he was writing at the suggestion of a named Virginia attorney who is a National Commissioner of ADL. The trial judge disclosed his response, a letter dated April 10, 1990, in which he stated that he had avoided and would continue to avoid reading the ADL publications which Gissen sent. Along with the trial judge's letter to Gissen, the trial judge sent four leaflets that had been disseminated in the Roanoke Valley area, which accused the trial judge of bias and questioned his relationship with the Virginia attorney and the ADL. In addition to the trial judge's disclosure of the nature and extent of these communications, he responded at length on the record to the grounds for recusal cited in Welsh's motion. The trial judge repeatedly stated that he was impartial and not biased against Welsh and that he had no interest in the

outcome of the case. He ultimately denied the motion.

On May 14, 1990, the trial judge held another hearing on Welsh's motions. These motions involved claims of selective and vindictive prosecution, and outrageous government misconduct. Welsh had subpoenaed Murray Janus for the hearing. In the course of argument as to whether Janus had to appear, counsel for Welsh asked the trial judge about the existence of correspondence concerning the case between himself and John Lichtenstein, a lawyer in Janus's firm and the son of the trial judge's former law partner. The trial judge agreed to look for such correspondence. On May 14 and 15, just prior to Janus's appearance, the trial judge disclosed four letters, dated March 7, March 26, March 29, and April 11, 1990, between himself and John Lichtenstein. On May 16, the trial judge disclosed a letter dated February 26, 1990, from him to Lichtenstein. When Janus testified on May 15, 1990, he, Janus, disclosed four letters dated March 6, March 29, April 16, and May 10, 1990, to Ira Gissen. The substance of all these letters related to LaRouche leaflets critical of Judge Weckstein or the ADL which Judge Weckstein had forwarded to Lichtenstein in his February 26 and March 26 letters. These leaflets were then passed from Lichtenstein to Janus and from Janus to Gissen and served as the catalyst, along with prompting from Murray Janus, for Gissen's April 2 letter to the trial judge, the disclosure of which had been made at the earlier hearing on the recusal motion.

When Janus testified at the May 14 hearing, he denied knowledge that Judge Weckstein was presiding at the "LaRouche" trials. At the conclusion of Janus' testimony, the trial court imposed sanctions on Welsh and counsel under Code § 8.01-271.1, a civil Code section, presumably for summoning Janus for the selective and vindictive prosecution motions to be heard when his evidence was immaterial to those inquiries. Subsequently, the court vacated the sanctions.

Welsh renewed his motion for the trial judge to recuse himself. The judge denied the motion. Afterward, Welsh sought to subpoena John Lichtenstein and Ira Gissen. The trial court refused Welsh's requests to subpoena them because the request as to Lichtenstein was untimely and because Gissen stated in an affidavit that he was unaware that Judge Weckstein continued to preside over "LaRouche" trials when the correspondence was sent,

and thus, his testimony would have been irrelevant.

Based on the foregoing evidence, the trial judge did not as a matter of law abuse his discretion by denying Welsh's recusal motion. The trial judge repeatedly found that he harbored no bias toward Welsh and that he could provide Welsh a fair trial. The letters and pamphlets sent between Judge Weckstein and Lichtenstein and Gissen do not establish bias on the part of the judge. It does not follow from this correspondence, the trial judge's personal letter to his friend, John Lichtenstein, who happened to be employed by Murray Janus, an ADL member, that the trial judge is actively or passively involved with the activities of the ADL or that he might have a personal interest in Welsh's case. The trial judge could not have been biased by the ADL materials sent by Gissen because he did not read them. Accepting as fact that the ADL opposes political positions espoused by Lyndon LaRouche, even if the trial judge were sympathetic to or affiliated with ADL, that fact does not, without more, constitute a basis for disqualification. The fact that a trial judge harbors political views, religious persuasion or values that are in direct opposition to those of the defendant does not, standing alone, constitute a basis for recusal. Even when circumstances create an appearance of bias, unless the conduct of the judge is shown to have affected the outcome of the case, the conviction will not be reversed, even though the judge may have infringed an ethical duty imposed by Canons of Judicial Conduct.[2] On these facts, the trial judge did not abuse his discretion in refusing to recuse himself.

## III. Vagueness

Welsh argues that the trial court erred in failing to dismiss the indictments because the statutes upon which they were based are unconstitutionally vague and thus, as applied to his case, violate due process. More specifically, Welsh contends that his prosecution under the Virginia Securities Act (VSA) offends due process because he did not at the time he was issuing promissory notes have notice or fair warning that promissory notes are securities governed by the VSA. The VSA expressly identifies notes as being included within the definition of securities. Furthermore, the

---

[2] Canon 3C(a) provides, in pertinent part: "A judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Rules of Supreme Court of Virginia, Pt. 6, § III, Canon 3C(a).

VSA's treatment of promissory notes as securities is not novel or atypical of the treatment afforded notes by the federal or other states' securities acts.

■ The proposition that a statute may be unconstitutionally vague is premised upon the doctrine that no person "shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Colten v. Kentucky*, 407 U.S. 104, 110 (1972). The test to determine whether a statute is unconstitutionally vague is whether it gives a reasonably intelligent person fair notice that his contemplated conduct is forbidden. *Flannery v. City of Norfolk*, 216 Va. 362, 366, 218 S.E.2d 730, 733 (1975), *appeal dismissed*, 424 U.S. 936 (1976).

■ Code § 13.1-501 defines "security" as "any *note*; stock; treasury stock; . . . *evidence of indebtedness*." (emphasis added). The VSA clearly and expressly includes "notes" within the definition of a security, and we have previously so held. *See Ascher v. Commonwealth*, 12 Va. App. 1105, 408 S.E.2d 906 (1991), *cert. denied*, 113 S. Ct. 190 (1992). Thus, the statute gives notice that a note is a security. The statute is not vague. Moreover, such a broad definition of "security" is not atypical. *Id.* at 1122-26, 408 S.E.2d at 917-19 (commenting on the breadth of the analogous Federal Securities Acts). Other states have similarly defined a security to include promissory notes. *Caucus Distribs., Inc. v. Commissioner of Commerce*, 422 N.W.2d 264, 270-72 (Minn. Ct. App. 1988), *cert. denied*, 488 U.S. 1006 (1989); *Caucus Distribs., Inc. v. Maryland Sec. Comm'r*, 320 Md. 313, 577 A.2d 783 (1990); *Caucus Distribs., Inc. v. State*, 793 P.2d 1048 (Alaska 1990). The VSA provides fair notice that promissory notes are within its ambit, and Welsh's contention is without merit.

For the foregoing reasons, we affirm Welsh's convictions.

*Affirmed.*

Barrow, J., and Moon, J., concurred.