# RICHARD E. WELSH

v.

# COMMONWEALTH OF VIRGINIA

Record No. 921385

November 5, 1993

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Hassell, JJ., and
Harrison, Retired Justice

Gerald T. Zerkin (Robert Godfrey; Kristine H. Smith, on briefs), for appellant.

Eugene Murphy, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In this case, we consider (1) whether the trial court applied correct legal principles in determining whether the prosecution by state officials was tainted through improper use of immunized testimony, and (2) whether the evidence supported the trial court's finding that the prosecution had met its burden of proving there was no taint.

From some time in the 1970s until convicted of the offenses involved in this appeal, the defendant, Richard E. Welsh, served as an accountant overseeing the financial activities of the National Caucus of Labor Committees (NCLC), an organization founded by Lyndon H. LaRouche, Jr., to promote his political activities in this country. Welsh also supervised the financial operations of a number of other LaRouche corporations, including Publication and General Management, Inc. (PGM).

In 1984, faced with substantial financial deficits, the LaRouche organization began soliciting loans from individuals nationwide, but misinformed prospective lenders about the financial condition of LaRouche's operations. Knowing at the time that loans could not be repaid, Welsh, as corporate secretary of PGM, executed and delivered letters of indebtedness and promissory notes to many of the lenders.

In the spring of 1986, federal and state authorities began investigating the financial activities of LaRouche and the individuals and corporations associated with him. This investigation involved the United States Attorneys' offices in Alexandria, Virginia, and

Boston, Massachusetts, the office of the Attorney General of Virginia, and the office of the Attorney General of New York.

Virginia's investigative and prosecutorial team was headed by Assistant Attorney General John Russell, aided by Assistant Attorneys General George Chabalewski, Marcia Davis, and Barbara Gaden. Investigator John Parthum of the State Corporation Commission, Donald Moore, Deputy Sheriff of Loudoun County, and Special Agent Charles Bryant of the Virginia State Police also assisted Russell. In addition to his role as deputy sheriff, Moore was commissioned as a Special United States Deputy Marshal to assist the federal investigatory teams in Alexandria and Boston.

Kent Robinson, Assistant United States Attorney, was the lead federal prosecutor in Alexandria. In Boston, Assistant United States Attorney John Markham headed a prosecutorial team that included Assistant United States Attorney Mark Rasch. Participating in the federal probe were investigators from the Federal Bureau of Investigation, the United States Secret Service, the Internal Revenue Service, and the United States Postal Service.

In the New York prosecution, Assistant Attorney General Katherine Law initially was the lead prosecutor, but she left the Attorney General's office in July 1988. Assistant Attorney General Dawn Cardi succeeded Katherine Law, and Cardi was assisted by Assistant Attorney General Rebecca Mullane.

On October 6 and 7, 1986, federal and state officers, armed with search warrants, seized more than 450 boxes, containing approximately 1,000,000 documents, from NCLC offices at Leesburg in Loudoun County. The investigators stored most of the seized items in a warehouse at Springfield in Fairfax County, where state and federal officers conducted an examination to identify those documents that might be useful in subsequent grand jury investigations and criminal prosecutions.

On February 17, 1987, a Loudoun County grand jury indicted a number of individuals and organizations associated with the LaRouche movement on a variety of charges stemming from the movement's fund-raising activities. Welsh was among those indicted, and he was charged with four counts of violating the Virginia Securities Act, Code §§ 13.1-501 to -527.3.[1] Retired Judge

---

[1] The promissory notes Welsh executed and delivered as corporate secretary of PGM formed the basis of the indictments against him. Under Code § 13.1-501, promissory notes constitute securities.

Carleton Penn of the Circuit Court of Loudoun County was designated by this Court to hear the cases, and, in the ensuing two years, he handled numerous motions filed by the several defendants.

A federal grand jury in Alexandria also investigated LaRouche's fund-raising activities. In May 1987, the grand jury subpoenaed Welsh as a witness. He notified the United States Attorney that he intended to invoke his Fifth Amendment privilege against self-incrimination. Assistant United States Attorney Robinson obtained an immunity order pursuant to 18 U.S.C. §§ 6001 *et seq.*[2] As a result, Welsh testified before the Alexandria grand jury on July 22, 1987, and on six other occasions.

In the fall of 1988, the Alexandria grand jury returned indictments against Lyndon LaRouche and six others on mail fraud charges. LaRouche was also indicted for conspiracy to defraud the Internal Revenue Service. In late 1988, Welsh was compelled, under an immunity order, to testify at trial of the Alexandria indictments.

In the meantime, beginning on December 17, 1987, and continuing until May 4, 1988, trial was conducted in Boston on indictments returned by a federal grand jury against several LaRouche associates. Welsh testified at the Boston trial under an immunity order. Trial of indictments returned by a New York grand jury began on April 10, 1989, and continued until August 31, 1989. Welsh did not testify in New York.

The first prosecution under the Virginia indictments occurred in January 1989, when Rochelle Ascher, a LaRouche fund-raiser, was brought to trial in Loudoun County. John Russell and George Chabalewski, Assistant Attorneys General of Virginia, prosecuted the case. Welsh did not testify at Ascher's trial.

On April 12, 1989, upon motion of the remaining Loudoun County defendants, including Welsh, Judge Penn granted a change of venue because of the ''extreme difficulty . . . encountered . . . in empaneling a jury'' at Rochelle Ascher's trial. The cases were transferred to the Circuit Court of Roanoke County, where Judge Clifford R. Weckstein of the Twenty-Third Judicial Circuit, acting under a designation issued by this Court, presided over the matter.

---

[2] Under 18 U.S.C. § 6002, a witness who invokes the privilege against self-incrimination may be compelled to testify by order of ''the person presiding over the proceeding . . .; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.''

The second Virginia prosecution under the Loudoun County indictments, involving Michael Billington, a LaRouche fund-raiser, took place in September 1989. Assistant Attorneys General John Russell and Barbara Gaden prosecuted the case. Welsh did not testify.

Welsh's trial on the Loudoun County indictments, with Russell as the lead prosecutor, was scheduled to begin on April 24, 1990. However, on March 30, 1990, Welsh filed a motion to dismiss "all charges" or, in the alternative, to suppress the evidence "to be presented against [him] at . . . trial." This motion sought "to determine whether and to what extent the Commonwealth made direct and/or derivative use of [Welsh's] immunized testimony" in preparation for trial of the indictments against him.

In a memorandum filed in support of the motion, Welsh claimed that under *Kastigar v. United States*, 406 U.S. 441 (1972), he was entitled to a hearing in which the Commonwealth would be required to show that the evidence it intended to introduce against him at trial was "derived from legitimate independent sources apart from leads derived from [his] immunized testimony." Absent such a showing, Welsh maintained, the Commonwealth's "proffered evidence must be suppressed."

After a pretrial hearing, the trial court denied Welsh's motion. Then, on May 7, 1990, pursuant to a plea agreement, Welsh entered a conditional plea of guilty to one felony count of selling unregistered securities with intent to defraud the purchaser. He also plead guilty to one misdemeanor count of transacting business as an unregistered agent and two misdemeanor counts involving the sale of securities.

The trial court convicted Welsh and sentenced him to seven years' imprisonment on the felony count, with execution of sentence suspended upon certain conditions. The court also sentenced Welsh to concurrent terms of twelve months on the three misdemeanor counts, with sentence suspended after he served seventy-five days in jail and performed community service.

In the plea agreement, Welsh reserved the right to appeal from the trial court's denial of several pretrial motions, including his

motion to dismiss or suppress.[3] Upon review of the reserved matters, the Court of Appeals affirmed Welsh's convictions. *Welsh v. Commonwealth*, 14 Va. App. 300, 416 S.E.2d 451 (1992). We awarded Welsh an appeal limited to the question whether the trial court erred in denying his motion to dismiss or suppress.

### Kastigar Hearing

The question for decision in *Kastigar* was "whether the [prosecution] may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony." 406 U.S. at 442.

The witness in *Kastigar* contended that "the scope of immunity provided by the federal witness immunity statute, 18 U.S.C. § 6002, is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, and therefore is not sufficient to supplant the privilege and compel testimony over a claim of the privilege." 406 U.S. at 448. "The constitutional inquiry," the Court stated, "is whether the immunity granted under this statute is coextensive with the scope of the privilege." *Id.* at 449.

Tracing the history of Congressional action and its own prior decisions on the subject of compelled testimony, the Court noted that "[w]hile a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader" and go so far as to encompass the concept of transactional immunity.[4] *Id.* at 453. Accordingly, the Court held that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Id.*

---

[3] Code § 19.2-254 provides that "[w]ith the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a felony case, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion."

[4] Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates [and] affords the witness considerably broader protection than does the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 453.

 The Court went on to say that "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.* at 460 (footnote omitted). And, the Court continued, " '[o]nce a defendant demonstrates that he has testified . . . under a . . . grant of immunity, . . . the [prosecuting] authorities have the burden of showing that their evidence is not tainted.' " *Id.* (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18 (1964)).

As the *Kastigar* court stated, the prosecution's burden is a "heavy" one, 406 U.S. at 461, and "is not limited to a negation of taint," *id.* at 460. Instead, the burden is on the prosecution to prove that "all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* at 461-62. "Most courts following *Kastigar* have imposed a 'preponderance of the evidence' evidentiary burden on the [prosecution]." *United States v. North*, 910 F.2d 843, 854 (D.C. Cir.), *modified*, 920 F.2d 940 (1990), *cert. denied*, ___ U.S. ___, 111 S.Ct. 2235 (1991) (citation omitted).

██ "When [a trial] court uses correct legal principles, its taint determination is a factual finding subject to review under the clearly erroneous standard." *United States v. Harris*, 973 F.2d 333, 337 (4th Cir. 1992). Welsh agrees this is the rule, but he contends that the trial court did not use correct legal principles. Consequently, he argues, the "clearly erroneous" standard does not apply, the trial court's findings are not entitled to deference, and we must conduct a *de novo* review.

We disagree with Welsh. The record demonstrates that the trial judge was fully conversant with the principles enunciated in *Kastigar* and that he applied them painstakingly. Hence, we will review his findings according to the "clearly erroneous" standard.

After a *Kastigar* hearing lasting six days, the trial court found the Commonwealth had met its burden of proving by a preponderance of the evidence that the evidence it proposed to use against Welsh at trial was derived from "a legitimate source wholly independent of the compelled testimony." Then, after Welsh was convicted and the decision in *North*, *supra*, was announced, Welsh moved "to reopen the Kastigar Hearing." Following argument, the trial court denied the motion and affirmed its earlier action, finding again that the

Commonwealth had carried its burden of proving by a preponderance of the evidence "that it had an independent source for the evidence used in preparing the prosecution of Mr. Welsh and to be used at trial." We turn to the record to determine whether this finding was clearly erroneous.

### The Commonwealth's "Chinese Wall"

At the *Kastigar* hearing, the Commonwealth undertook to show that it had erected a "Chinese Wall" to insulate the members of its prosecutorial and investigative team from the prosecutors and investigators, both federal and state, who had access to Welsh's immunized testimony. As noted previously, the million or so documents seized in the search of LaRouche offices in Leesburg on October 6 and 7, 1986, were stored in a warehouse at Springfield. Virginia State Police Special Agent Charles Bryant and a number of federal agents worked together at Springfield sorting and examining the documents. Bryant had been informed by Assistant Attorney General Chabalewski of "the need to be absolutely screened from any immunized testimony of Richard Welsh," and lead prosecutor Russell gave Bryant the same advice.

The federal agents who were engaged in examining the documents knew that the Virginia authorities were not to be exposed to any information concerning Welsh. Accordingly, the federal agents would cease any discussion concerning Welsh when Bryant entered the room or, if he were already present, they would ask him to leave if they planned to discuss any grand jury matters involving Welsh.

Prior to seeking the order immunizing Welsh's testimony, federal prosecutor Robinson contacted Virginia's lead prosecutor, John Russell, to ascertain whether Russell thought "immunizing Richard Welsh . . . would present any problems for [Virginia's] prosecution." Russell said he did not think the immunization "would pose any problem, so long as [the federal authorities] made sure that [Russell and the people working with him in the State case] didn't learn anything that Mr. Welsh said during the course of his immunized testimony."

Concerning Loudoun County Deputy Sheriff Donald Moore, who assisted the Boston authorities in their LaRouche investigation, Chabalewski wrote letters to Moore himself, to the Sheriff of Loudoun County, who was Moore's employer, and to John Markham and Mark Rasch, the federal prosecutors in Boston. The

letters admonished each addressee of the need for Moore to be insulated from any information concerning Welsh's immunized testimony. In addition, Russell telephoned Markham and told him to avoid telling "anyone from Virginia anything that Mr. Welsh testified to while he was on the Stand" in Boston. Rasch, Markham's assistant, undertook to "keep Donald Moore away" from any information relating to Welsh. Moore actually left Boston during the time Welsh testified.

Dawn Cardi and Rebecca Mullane, the New York prosecutors, had access to Welsh's immunized testimony and also had contact with the Virginia authorities in preparing the New York case for trial. But, as a result of conversations with Russell, the New York prosecutors were "aware that they were not to discuss Richard Welsh's testimony" with the Virginia authorities. Indeed, on Cardi's "first meeting . . . with John Russell," he told her he could not "discuss Richard Welsh with [her]," and she "understood that because [she] had [another LaRouche defendant] in a similar situation."

With respect to the handling of documentary evidence, measures were employed to segregate and make inaccessible to Virginia authorities those documents that were to be used in federal grand jury proceedings. Documents identified as "important" by either state or federal agents were placed in a so-called "goody box." Documents chosen by the federal agents for grand jury use were photographed, and the copies were labelled with "Grand Jury exhibit stickers." The labelled copies were then stored in a separate filing cabinet, accessible only to federal agents, for later presentation to grand juries. The originals were returned to the "goody box" without "stickers" or other labelling to indicate they had been used for grand jury purposes. As a result, a state agent examining a particular document found in the "goody box" would not have been put on notice that the document may have been considered important, or had been used, in the grand jury proceeding in which Welsh gave his immunized testimony.

### Independent Sources

The Commonwealth also undertook to show that the evidence it proposed to use against Welsh at trial was derived from legitimate independent sources. First of all, as noted previously, Welsh was indicted by the Loudoun County grand jury on February

17, 1987, more than five months before he first testified under an immunity order in his appearance before the Alexandria grand jury on July 22, 1987. Hence, as the Court of Appeals observed, ''nothing [Welsh] said in his immunized testimony could have influenced the Virginia authorities in their decision to indict him.'' 14 Va. App. at 310, 416 S.E.2d at 457.

Furthermore, by the time Welsh was indicted, the numerous documents seized in the October 1986 search at Leesburg ''had been narrowed down to a much smaller universe,'' the investigation into Welsh's activities was 90 to 95% complete, and the prosecution had developed a ''Welsh file'' containing all documents seized in the Leesburg search that were written by or addressed to Welsh or that made reference to him by name. Most of the documents the Commonwealth intended to introduce against Welsh, including bank records, had already been used by the Commonwealth in prosecutions of other LaRouche associates. Thereafter, exhibits ''unique to Mr. Welsh [in the form of documents] provided by victim witnesses . . . relating specifically to loan transactions'' were added to the file.

■ Also, the Commonwealth ''canned'' its evidence, meaning it recorded the time the prosecution acquired knowledge of the existence of a particular item, in several ways. First, all the documents in the ''Welsh file'' were numbered sequentially by the use of a ''Bates Stamp.'' Second, when the Commonwealth learned of Welsh's prospective appearance as a witness at the Boston trial, each document in the ''Welsh file'' was stamped with the date February 4, 1988, to show its presence in the file on that date.[5] Third, a ''document control sheet'' was attached to each ''potentially useful'' piece of evidence seized in the October 1986 Leesburg search showing the name of the Commonwealth's agent who had identified it and the date of its identification.[6]

■ Finally, the Commonwealth established that even before Welsh was indicted it had identified and interviewed most of the witnesses it intended to use against him at trial and that the remainder were identified and interviewed before he gave his immunized testimony or were derived from sources other than the testimony

---

[5] Welsh first testified in Boston on February 17, 1988.

[6] This practice enabled the Commonwealth to establish that a significant number of the documents it proposed to use against Welsh had been identified by Investigator John Parthum of the State Corporation Commission well before the date of Welsh's immunized testimony before the Alexandria grand jury.

itself. The names of victim witnesses came "almost exclusively [from] the analysis of loan records . . . done shortly after the October 6th and 7th [, 1986] search"; victim witnesses added later either originated from further analysis of the loan records or from "people calling [in as a result of] publicity given to the search."

The chief "insider" witnesses the Commonwealth intended to use against Welsh at trial were former LaRouche associates Wayne Hintz and Christian Curtis. Deputy Sheriff Donald Moore interviewed Curtis in November 1986, "[r]ight after the search." The Commonwealth began "focusing on Chris Curtis as a witness . . . at least as early as December of '86." In December 1986 or January 1987, Assistant Attorney General John Russell interviewed Curtis on one occasion and State Police Special Investigator Charles Bryant conducted "several interviews" with Curtis, who was cooperating with both state and federal authorities in the LaRouche investigation.

Curtis informed the state investigators that Hintz "had left the [LaRouche] organization and might be willing to cooperate" as he, Curtis, "was doing." In January 1987, Charles Bryant met with Hintz and discussed the possibility of "his cooperating with the Commonwealth." Bryant conducted "at least five very lengthy interviews" with Hintz in February and March 1987.

■ "[A]t least as early as March of 1987," the Virginia prosecutors "knew that both Chris Curtis and Wayne Hintz would play central roles in any . . . Virginia trials and prosecutions." And, at that early time, the prosecutors knew the substance of the testimony both Curtis and Hintz would give. This, of course, was at least four months before Welsh gave his immunized testimony on July 22, 1987.

### Specific Instances of Taint

Welsh argues that there are "holes in [the Commonwealth's Chinese] Wall" and, therefore, that the "wall" was insufficient to guarantee the absence of taint. Welsh also says the Commonwealth failed to show that its testimonial and documentary evidence, even if independently discovered, was not tainted by Welsh's immunized testimony.

■ In the Court of Appeals, Welsh cited eleven specific instances of alleged taint that, in his view, demonstrated the Commonwealth's failure to meet its *Kastigar* burden. 14 Va. App. at

311, 416 S.E.2d at 457-58. He cites the same instances here and adds new ones to the list. However, we will consider only the eleven he cited in the Court of Appeals. Each instance will be worded in the language employed in that court's opinion.

(1) Virginia investigator Charles Bryant had extensive contact with the federal agents who had access to Welsh's immunized testimony while Bryant was engaged in the document selection process at the Springfield warehouse.

 As we demonstrated *supra*, Welsh was indicted more than five months before he gave immunized testimony and, at the time of his indictment, the Commonwealth's investigation into his activities was 90 to 95% complete. Then, as also noted *supra*, once the Commonwealth learned Welsh had been immunized, elaborate measures were instituted to insulate Bryant from receiving knowledge of Welsh's immunized testimony through contacts with federal agents.

(2) LaRouche operatives, Chris Curtis and Wayne Hintz, were interviewed in the presence of Virginia prosecutors and agents by federal agents and prosecutors from New York who had had access to Welsh's immunized testimony.

 As noted previously, Curtis and Hintz had been identified as prosecution witnesses, they had been interviewed extensively by state agents, and the substance of their testimony had been known by the Virginia prosecutors long before Welsh testified as an immunized witness on July 22, 1987. And, although as Welsh asserts, Hintz was interviewed after Welsh gave his immunized testimony, the Commonwealth's evidence showed that the subsequent interviews were merely in "preparation for trial" and yielded nothing "new, additional and more elaborate."

(3) Virginia investigator Bryant selected lender witnesses to be used in Welsh's prosecution based on reports compiled by federal agents who had been exposed to Welsh's testimony and which reports summarized the interviews with them.

 The evidence showed that the Commonwealth's list of lender witnesses was developed from an analysis made by Virginia agents

of the loan records seized in the search of October 6 and 7, 1986, before Welsh was indicted and prior to the time he gave his immunized testimony.

(4) Assistant Attorneys General Russell and Chabalewski attended portions of the opening statements in the Boston trial and may have been influenced in trial strategy or exposed to evidence derived from Welsh's immunized testimony.

(5) Russell and Chabalewski read media accounts of the Boston and Alexandria trials at which Welsh testified.

 While the record shows Russell "attended a small portion" of the opening statements at the Boston trial, he testified at the *Kastigar* hearing that he did not know "what the testimony of Richard Welsh was at [that] trial." With respect to Chabalewski, although he was present during the entire opening statements in Boston, he testified he did not "learn anything from that opening statement [he] didn't already know," and he had previously testified he had never received any information "in any form . . . that had to do with Richard Welsh's immunized testimony." And, while Russell and Chabalewski read "some media coverage" of the Alexandria and Boston prosecutions, the articles had been subjected to a "screening process," before Russell and Chabalewski read them, to eliminate any reference to Welsh's immunized testimony.

(6) Russell and Chabalewski had extensive contact with Dawn Cardi and Rebecca Mullane, the New York prosecutors who had access to Welsh's immunized testimony.

 Although Cardi and Mullane had not read the immunized testimony Welsh gave in Alexandria, they had been exposed to his Boston testimony. Both stated at the *Kastigar* hearing, however, that they had never discussed Welsh or his testimony with the Virginia prosecutors.

(7) Russell read the Alexandria indictment, which was based in part on Welsh's immunized testimony.

 It is true that Russell read the Alexandria indictment and that it was based in part on Welsh's immunized testimony. But, without

having read or having otherwise become familiar with Welsh's testimony, Russell could not have known that portions of the indictment came from the testimony. Nor would those allegations of the indictment that actually mention Welsh have put Russell on notice that they were based upon Welsh's testimony; the allegations could just as well have been framed from documents seized in the 1986 search or from witnesses who testified about the same matters that Welsh covered in his testimony.

(8) Karen Koch, a legal assistant for the Commonwealth with the Attorney General's office, heard a portion of Welsh's immunized testimony at the Alexandria federal prosecution.

█ Karen Koch, a paralegal, did attend the Alexandria trial. Before she left her office to go to court, she heard Russell tell Investigator Bryant "not to stay in the courtroom" during Welsh's testimony, but she was uncertain whether the admonition applied to her. However, she stayed for only fifteen minutes of Welsh's statement, during which she "just tuned out the testimony" and wrote a letter to a friend. She left the courtroom when Assistant United States Attorney Robinson informed her during a recess that she should leave. In a contemporaneous memorandum memorializing the incident, she stated that she could not "remember much of [the testimony] anyway" and that she did not discuss Welsh's testimony with anyone. She testified to the same effect at the *Kastigar* hearing.

(9) The Commonwealth obtained copies of all the Alexandria federal trial transcripts, including those of Welsh's immunized testimony.

█ Transcripts of the Alexandria federal trial were received in the Attorney General's office by Karen Koch. At the direction of Assistant Attorney General Chabalewski, Koch removed the segments containing Welsh's testimony from the previously unopened box and, without reading them, placed them in a manila envelope, initialed the seal, and put tape over her initials. When examined at the *Kastigar* hearing, the envelope did not appear to have been opened.

(10) [J]ust before the trial of Michael Billington, Billington moved to call Welsh as a defense witness and supported the

motion to call Welsh with a *pro se* submission that summarized portions of Welsh's testimony, which summary was read by Russell.

(11) [A]t a hearing on Billington's motion to subpoena Welsh, at which Russell and Barbara Gaden were present, the trial judge referred specifically to portions of Welsh's immunized testimony.

Michael Billington sought by motion to have Welsh summoned as a defense witness in his trial. During a discussion of the motion in Russell's presence, Billington submitted a statement explaining "why Richard Welsh is a necessary witness for Michael Billington." Russell read the statement, and the trial judge orally analyzed the effect Welsh's testimony might have on Billington's defense.

The content of Billington's statement was either already known by the Commonwealth or was self-serving and exculpatory. The Court of Appeals aptly characterized the contents of the statement as material "that the government did not use and . . . which the government would have had no reason to use in the prosecution of Welsh." 14 Va. App. at 314, 416 S.E.2d at 459.

■ Contrary to Welsh's assertion on brief, the trial judge did not "read immunized statements from Welsh" or otherwise detail the substance of Welsh's testimony. Rather, conscious of what he said was the need "not to pollute the prosecutor," the judge made only general references to Welsh's testimony and merely assessed the effect his appearance as a witness might have on Billington's defense. And, beyond all that, Russell testified at the *Kastigar* hearing that neither "the Billington statement [nor] Judge Weckstein's remarks . . . influence[d] or focus[ed] in any way [his] preparation or investigation for the Welsh trial."

■ As the Court of Appeals observed, "each of these occurrences creates an abstract possibility of taint." 14 Va. App. at 311, 416 S.E.2d at 458. And, as the Court of Appeals also observed, the burden of proof imposed by *Kastigar* does not require the prosecution to "negate every abstract possibility of taint." *Id.* (citing *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985)). Furthermore, " '[t]he focus of the inquiry under *Kastigar* . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a

case against the defendant.' '' *Harris*, 973 F.2d at 338 (quoting *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986), *cert. denied*, 483 U.S. 1021 (1987)).

We are satisfied that the ''Chinese Wall'' erected by the Commonwealth was sufficient to keep its prosecutors and agents unaware of the contents of the immunized testimony and that the Commonwealth proved by a preponderance of the evidence it had legitimate independent sources for the evidence it proposed to use against Welsh. But, in any event, we are equally satisfied that the prosecution did not use the immunized testimony, either directly or indirectly, to build a case against Welsh.

In making these observations, we are not unmindful of *Kastigar's* promise that ''[a] person accorded . . . immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.'' 406 U.S. at 460. But we know that a ''taint determination [under *Kastigar*] is a factual finding,'' *Harris*, 973 F.2d at 337, and it is certain that, as with most factual determinations, the outcome depends upon whether the trier-of-fact chooses to believe or disbelieve a particular witness or a particular group of witnesses.

Here, it is obvious that the trial court, as it had a perfect right to do, chose to believe the prosecuting authorities who participated in the investigation at issue in this case. Once believed, their testimony, along with the other evidence in the case, provided support for the trial court's finding that the Commonwealth had met its *Kastigar* burden of proof. This did not make ''the preservation of [Welsh's] rights [dependent] upon the integrity and good faith of the prosecuting authorities,'' *Kastigar*, 406 U.S. at 460, but, rather, upon the integrity and good faith of the fact-finding judicial process.

Welsh cites a number of cases in which it was held the *Kastigar* burden had not been met. Because they present substantially different factual situations involving clear misuse of immunized testimony, we find the cases inapposite. *E.g.*, *United States v. Harris*, *supra*, (government found file only after witness gave immunized testimony revealing file's location); *United States v. North*, *supra*, (government used immunized testimony to refresh memory of witnesses).

The Court of Appeals held the trial court was ''not clearly erroneous'' in finding that the Commonwealth had met its burden of

proof. We agree with the Court of Appeals and, accordingly, will affirm its judgment.[7]

*Affirmed.*

---

[7] In view of the disposition we make of the case, we do not consider Welsh's contention that the "courts below erred in failing to disqualify the Commonwealth's prosecution team."