COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Kelsey
Argued at Salem, Virginia


MATTHEW EDWARD BILLIPS

OPINION BY
v.        Record No. 0172-05-3        JUDGE JEAN HARRISON CLEMENTS
JUNE 6, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
Henry A. Vanover, Judge

Terrence Shea Cook (T. Shea Cook, P.C., on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Judith
Williams Jagdmann, Attorney General, on brief), for appellee.


Matthew Edward Billips appeals the sentences imposed by the trial judge following

Billips's conviction in a jury trial of criminal solicitation, in violation of Code § 18.2-29, and two

counts of forcible sodomy, in violation of Code § 18.2-67.1.  Billips contends the trial judge

erred at sentencing in (1) refusing to recuse himself after inappropriately receiving a sentencing

verdict from the jury, (2) admitting the sentencing guidelines portion of the presentence report

into evidence even though Billips was a juvenile when the offenses were committed, and

(3) admitting the risk assessment portion of the presentence report into evidence without first

determining that the scientific evidence contained therein concerning a plethysmograph

examination was reliable.  For the reasons that follow, we affirm Billips's sentences.

I.  BACKGROUND

Viewed in the light most favorable to the Commonwealth, the prevailing party below, see

Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975), the evidence

presented at trial established that, on May 10, 2003, Billips was living with his aunt and uncle,

Wanda and Wayne Wood, in Tazewell County.  The Woods' step-grandsons, C.H. and S.H., were also spending the night with the Woods on that date.  That evening, while the Woods were downstairs watching television, Billips, whose date of birth was November 15, 1985, went upstairs to his bedroom where C.H. and S.H. were playing video games.  Shortly after entering the room, Billips asked S.H., who was ten years old, to perform oral sex on him.  After S.H. refused, Billips persuaded C.H., who was nine years old, to perform oral sex on him.  Billips then performed oral sex on C.H.

On June 3, 2003, Billips was charged with feloniously sodomizing C.H., a child less than thirteen years of age, in violation of Code § 18.2-67.1.  On June 26, 2003, the juvenile and domestic relations district court found probable cause and certified Billips's case to the trial court.  On August 12, 2003, a grand jury indicted Billips on two counts of forcible sodomy, in violation of Code § 18.2-67.1, and one count of criminal solicitation, in violation of Code § 18.2-29.  A trial by jury was held on April 20, 2004.  At the conclusion of the evidence and argument by counsel, the jury found Billips guilty as charged.

The trial then proceeded to the sentencing phase.  Without objection by either party, the jury continued to sit in the trial.  The Commonwealth introduced evidence of Billips's prior convictions as a juvenile for grand larceny of a motor vehicle, felony escape, abduction, carjacking, and malicious wounding.  After hearing the defense's evidence in mitigation and the argument of counsel, the jury fixed Billips's sentence at twenty-five years for each of the sodomy convictions and five years for the solicitation conviction, for a total sentence of fifty-five years.

After the jury was excused, the following colloquy took place:

> [DEFENSE COUNSEL]:  Your Honor, at this time we have a motion to set aside the verdict rendered by the jury as well as in the alternative a motion to stay the imposition of the sentence until after

- 2 -

a presentence report can be considered by the Court along with a set of sentencing guidelines.

THE COURT: All right. I'll tell you what the Court would do. The Court will order that a presentence report be prepared prior to sentencing. And will order also as part of that presentence report that a psychosexual evaluation be performed of Mr. Billips. And the Court will also give you, if you desire, ten days to file any written post-trial motions that you desire to file. And I will give the Commonwealth, if they desire, ten days to respond in writing to those motions. And we can set any motions that you want to file for hearing at the same time we set a sentencing [hearing]. Is that satisfactory?

[DEFENSE COUNSEL]: Yes, Your Honor.

The trial judge then ordered that a presentence report, including a sentencing guidelines report and a psychosexual evaluation report, be "prepared for the court's consideration prior to sentencing," pursuant to Code §§ 19.2-299, 19.2-298.01, and 19.2-300. Jennifer Helbert, the probation officer who prepared Billips's presentence report, referred Billips to Counseling and Consultation Services, Inc., a local non-profit corporation specializing in the "assessment and treatment of sexual offenders," for evaluation. Cheryl Clayton, the corporation's Director of Virginia Services, and Dr. Ronald J. Ricci, Ph.D., examined Billips and performed a "Risk Assessment designed to address present risk to reoffend and to generate treatment recommendations." Following preparation of the presentence report, including the sentencing guidelines report and the risk assessment report, the trial judge held a sentencing hearing on October 4, 2004.[1]

At the outset of the sentencing hearing, the trial judge heard argument on Billips's motion to have the trial judge recuse himself and allow another judge to do the sentencing. After pointing out that, pursuant to Code § 16.1-272, the jury should not have been allowed to

---

[1] By order entered October 4, 2004, Billips's current counsel was substituted for his original counsel.

- 3 -

recommend a sentence in this case, Billips argued that, in order to avoid the perception that the trial judge may have been influenced by the jury's "harsh" and "severe" sentencing verdict, the trial judge should recuse himself and allow another judge to determine Billips's sentence or preside over a new trial, if appropriate. The trial judge denied the motion, stating that he was able to "set aside the [jury's] recommendation" in determining an appropriate sentence and that the jury's recommendation would have no "greater effect" on him than on "another sentencing judge who would be aware [from the record] of . . . what the jury had done."

Thereafter, Helbert recounted Billips's juvenile criminal record and testified regarding a psychological assessment of Billips conducted in 1997. Helbert recommended that Billips be incarcerated.

When the Commonwealth sought to introduce the presentence report into evidence, Billips initially objected to the admissibility of the sentencing guidelines report included in the presentence report. Billips argued that the sentencing guidelines, which recommended an incarceration range of twenty years and five months to fifty-nine years and nine months, were geared to adults and should not apply in this case because he was a juvenile at the time the offenses were committed. Citing the defense's failure to provide any authority supporting its position, the trial judge denied Billips's objection.

Billips then objected to the admissibility of the risk assessment report included in the presentence report, arguing that the risk assessment report was impermissibly based on the results of a polygraph examination and a penile plethysmograph examination. A plethysmograph, Billips argued, is as unreliable as a polygraph in that they both measure a person's physical response to certain stimuli and, thus, should be similarly inadmissible. Sustaining Billips's objection with regard to the risk assessment report's reliance on a polygraph examination, the trial judge directed that a new risk assessment report be prepared "without any

- 4 -

consideration of any type of polygraph examination." However, noting that "[t]here is some difference" between polygraphs and plethysmographs and that, unlike polygraphs, there is no "specific case law" in Virginia dealing with plethysmographs, the trial judge denied Billips's objection with regard to the risk assessment report's reliance on a plethysmograph examination. The trial judge continued the sentencing hearing to allow for revision of the risk assessment report.

Following completion of the revised risk assessment report, the sentencing hearing recommenced on October 26, 2004. Clayton testified regarding the various factors she and Dr. Ricci used to assess the risk that Billips would re-engage in similar deviant sexual behavior. Discussing those factors, Clayton testified that Billips admitted during an interview that he had sexual contact when he was twelve years old with one of the victims but denied he committed the crimes for which he was convicted. Likewise, Clayton testified, Billips exhibited no signs of empathy toward the victims. Clayton explained that Billips's denial of culpability and his lack of empathy indicated he did not believe he had "a problem with sexual offending," which suggested "a poor treatment outcome."

Clayton further testified that Billips and his parents claimed the charges against him had been fabricated because he would not obtain drugs for members of the victims' family. Such a belief on the part of the parents, Clayton opined, indicated they did not believe Billips had a sexual offense problem and suggested they would be unlikely to provide adequate supervision within the community.

Clayton also testified that, using a "comprehensive risk to reoffen[d] scale" to assess Billips's likelihood of reoffending, she and Dr. Ricci determined that Billips posed "a moderate reoffense risk." Clayton explained that Billips's score was based on a "variety of different factors," including the nature of the offenses he committed; the age and sex of the victims; the

number of victims; the length of time he knew the victims; the means by which he gained access to the victims; the length of time he had been engaging in deviant sexual behavior; his social and familial relationships; his employment, criminal, and mental health histories; his substance abuse issues; and the results of his penile plethysmograph examination.

Clayton testified, over Billips's objection, that the plethysmograph examination administered to Billips indicated he had five primary areas of elevated deviant arousal response, including "clinically significant deviant arousal" to various sexual scenarios involving young boys and girls. Clayton further testified that, with respect to assessing a person's risk to reoffend based on a plethysmograph examination, "individuals who have three or more areas of elevated deviant response . . . are in the highest reoffense category."

Over Billips's objection, the trial judge then admitted the revised risk assessment portion of the presentence report into evidence. In describing the purpose of the risk assessment performed on Billips, the report stated:

> Our responsibility is two-fold. First and foremost is the protection of the community from further sexual assault. The second responsibility is the rehabilitation of the offender so that the risk to reoffend is minimized. Our assessment is not designed, nor is an assessment available, that can "prove" guilt or innocence.

The risk assessment report listed the various sources of information used to prepare the assessment—including "Collateral Information" from the probation officer, a "Client Social History Questionnaire," "Intake" and "Clinical" interviews, a "Cognitive Distortion Scale," a "Sexual Scenario Rating Scale," a "Family Assessment," and a "Penile Plethysmograph Assessment"—and detailed the factors cited by Clayton that were used to assess Billips's risk of reoffending under the "Comprehensive Risk to Reoffend Scale." With regard to the penile plethysmograph examination, the risk assessment report stated as follows:

> A Penile Plethysmograph Assessment evaluates the presence or absence of deviant sexual arousal. Research has

demonstrated that deviant sexual arousal is one of the best indicators of risk to sexually reoffend. As used by our agency, the penile plethysmograph is designed to measure sexual responsiveness to a variety of stimuli. Males and females ranging in age from infant to adult are represented in the stimuli. Visual stimuli are accompanied by audio stimuli describing behavior across a range of different sexual activity.

. . . Mr. Billips'[s] response pattern represents elevated responses to three or more categories across gender[, which] places Mr. Billips in the highest reoffense risk category. Deviant arousal to children has been shown to be the strongest indicator of recidivism.

Upon consideration of the presentence report, including the sentencing guidelines report and the risk assessment report included therein; the Commonwealth's victim-impact evidence from the victims' mother; and Billips's evidence in mitigation, the trial judge found that "the nature of [Billips's] offenses warranted deviation from the [sentencing] guidelines," which "were too low under the circumstances . . . of these cases." Accepting the Commonwealth's recommendation, the court imposed life sentences for the two forcible sodomy convictions and a five-year sentence for the criminal solicitation conviction. In announcing the sentences, the trial judge stated that he could not imagine a more "heinous offense" than that committed by Billips. The trial judge further stated that he could "see no expression by [Billips] of any type of true empathy or remorse or understanding of the consequences of [his] crimes."

The trial judge entered the sentencing order on January 4, 2005, and this appeal followed.

## II. RECUSAL

Although tried as an adult, Billips was seventeen years old when he was indicted for the instant offenses. Thus, the trial judge should have fixed Billips's sentence "without the intervention of [the] jury." Code § 16.1-272(A). However, the jury continued to sit in the penalty phase of the trial and recommended a total prison term of fifty-five years. Neither party

objected to the jury's participation in the penalty phase, and Billips does not challenge his sentence on that ground, on appeal.

Instead, Billips contends that, having received the jury's inappropriately rendered sentencing verdict, the trial judge should have recused himself from the case so that a new judge, untainted by the jury's sentencing decision, could have been appointed to impose sentence. Such a recusal was necessary, Billips argues, because the trial judge's knowledge of the jury's "harsh" sentencing verdict gave rise to the perception that the judge's imposition of sentence would be influenced by that verdict. That perception, Billips adds, was borne out by the severe sentence imposed by the trial judge, which clearly demonstrates the judge was "prejudiced" by the jury's sentencing verdict and had an "inflamed bias" against Billips as a result. Thus, Billips concludes, the trial judge's refusal to recuse himself violated Billips's due process right to be sentenced by an impartial judge and constituted an abuse of discretion. We disagree.

The law governing this issue is well settled. "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). The due process right to a fair tribunal applies to both the guilt and sentencing phases of a criminal trial, see Witherspoon v. Illinois, 391 U.S. 510, 518 (1968), and requires the trial judge to be "neutral and detached," Ward v. Village of Monroeville, 409 U.S. 57, 61-62 (1972). Indeed, the judge "must possess neither actual nor apparent bias against a party, and 'in the most extreme of cases' of bias, where, for example, a judge has a personal stake in the outcome of litigation, the judge's recusal will be required." United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003) (quoting Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821 (1986)). "[T]he inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between

vindicating the interests of the court and the interests of the accused.'" Taylor v. Hayes, 418

U.S. 488, 501 (1974) (quoting Ungar v. Sarafite, 376 U.S. 575, 588 (1964)).

> Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar.

Bracy v. Gramley, 520 U.S. 899, 904 (1997) (citation omitted); see also FTC v. Cement Institute,

333 U.S. 683, 702 (1948) (noting that "most matters relating to judicial disqualification [do] not

rise to a constitutional level").

The Canons of Judicial Conduct for the Commonwealth of Virginia provide that "[a]

judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might

reasonably be questioned." Canon 3(E)(1). Accordingly, "a judge must diligently avoid not

only impropriety but a reasonable appearance of impropriety as well." Davis v. Commonwealth,

21 Va. App. 587, 591, 466 S.E.2d 741, 743 (1996). The question, therefore, "whether a trial

judge should recuse himself or herself is measured by whether he or she harbors [or reasonably

appears to harbor] 'such bias or prejudice as would deny the defendant a fair trial.'" Welsh v.

Commonwealth, 14 Va. App. 300, 314, 416 S.E.2d 451, 459 (1992) (quoting Justus v.

Commonwealth, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981)), aff'd, 246 Va. 337, 437 S.E.2d

914 (1993).

"[T]he party moving for recusal of a judge has the burden of proving the judge's bias or

prejudice." Commonwealth v. Jackson, 267 Va. 226, 229, 590 S.E.2d 518, 519-20 (2004). "A

purported violation of the Canons alone is not enough to mandate recusal." Id. at 229, 590

S.E.2d at 519; see Davis, 21 Va. App. at 591, 466 S.E.2d at 743 (noting that a judge is not

required "to recuse himself or herself and disrupt the orderly flow of the docket at the whim or

unsupported suggestion of a party"). "In the absence of proof of actual bias [or prejudice],

recusal is properly within the discretion of the trial judge." Jackson, 267 Va. at 229, 590 S.E.2d at 520; see Davis, 21 Va. App. at 591, 466 S.E.2d at 743 ("Exactly when a judge's impartiality might reasonably be called into question is a determination to be made by that judge in the exercise of his or her sound discretion."). "In exercising his [or her] discretion in this regard, the judge must be guided not only by the true state of his [or her] impartiality, but also by the public perception of his [or her] fairness, in order that public confidence in the integrity of the judiciary may be maintained." Stamper v. Commonwealth, 228 Va. 707, 722, 324 S.E.2d 682, 686 (1985).

Examining the instant record with these considerations in mind, we hold that the trial judge's knowledge of the jury's improperly rendered sentencing verdict did not require his recusal. Acknowledging at the sentencing hearing that consideration of the jury's sentencing verdict was inappropriate in this case, the trial judge explicitly indicated that he could, and would, disregard the jury's recommendation in determining Billips's sentence. We find no reason to disbelieve "the court's unequivocal statement," Overton v. Commonwealth, 260 Va. 599, 604, 539 S.E.2d 421, 424 (2000), or to question the judge's ability to do what he said he could and would do. Likewise, we find no reason to believe that a reasonable member of the public would have cause to doubt the judge's assurance that he would disregard the jury's recommendation or his ability to do so. It is widely accepted that "[a] judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both." Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981); see Johnson v. Commonwealth, 12 Va. App. 391, 397, 404 S.E.2d 384, 387 (1991) (holding that a trial judge, unlike a juror, has the ability at sentencing to disregard an inadmissible inculpatory statement by the defendant). In fact, trial judges are

routinely required to disregard "matters that would be prejudicial if considered when deciding the case." Farren v. Commonwealth, 30 Va. App. 234, 239, 516 S.E.2d 253, 256 (1999). Consequently, we have held that, notwithstanding a trial judge's knowledge of evidence that is immaterial and incompetent, the judge is presumed to have correctly disregarded such evidence, absent "clear evidence to the contrary." Cole v. Commonwealth, 16 Va. App. 113, 116, 428 S.E.2d 303, 305 (1993). There is nothing in the record that rebuts that presumption here.

Moreover, we find nothing in the record that indicates the trial judge harbored any actual or apparent bias or prejudice against Billips as a result of the judge's awareness of the jury's sentencing verdict. Billips argues that the harsh sentence imposed by the trial judge indicates the trial judge's objectivity was tainted by the jury's recommendation. This argument is without merit. The jury recommended a sentence of twenty-five years for each of Billips's two forcible sodomy convictions. In sentencing Billips to life imprisonment for each of the two forcible sodomy convictions, the trial judge imposed the maximum sentence permitted by law. See Code § 18.2-67.1(B) ("Forcible sodomy is a felony punishable by confinement in a state correctional facility for life or for any term not less than five years."). Plainly, had the trial judge's objectivity been influenced by the jury's recommendation, as Billips claims, the trial judge would have imposed a sentence more in keeping with the jury's recommended sentence, rather than the maximum possible. In addition, the imposition by the trial judge of the maximum sentence permitted by law is not, by itself, sufficient to show that the trial judge harbored actual or apparent bias or prejudice against the defendant. Wilson v. Commonwealth, 46 Va. App. 408, 430, 617 S.E.2d 431, 442 (2005) (plurality opinion), petition for appeal granted, No. 051968 (Va. Sup. Ct. Order of December 21, 2005); see Abdo v. Commonwealth, 218 Va. 473, 479, 237 S.E.2d 900, 903 (1977) ("When a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse

of discretion."); <u>Robinson v. Commonwealth</u>, 13 Va. App. 540, 542, 413 S.E.2d 661, 662 (1992) ("'If the sentence is within the range set by the legislature, an appellate court will not interfere with the judgment.'" (quoting <u>Hudson v. Commonwealth</u>, 10 Va. App. 158, 160-61, 390 S.E.2d 509, 510 (1990))). Billips points to no other evidence as proof of the trial judge's actual or apparent bias or prejudice.

Because the record is devoid of any indication that the trial judge's sentencing determination was affected by the judge's knowledge of the jury's sentencing verdict, and because the judge's impartiality cannot reasonably be questioned on that basis, we hold that the trial judge did not violate Billips's right to due process or abuse the judge's discretion in refusing to recuse himself and appoint another judge to determine Billips's sentence.

### III.  SENTENCING GUIDELINES

In his second claim of error, Billips contends solely that "[t]he sentencing guidelines in this case should not have been prepared [by the probation officer] or considered by the trial court" in determining his sentence because the guidelines are geared to adults and penalize juvenile offenders.  Because the court actions challenged by Billips on appeal arose from his own conduct at trial, we need not address the merits of his claim.

The record demonstrates that, after the jury found Billips guilty and fixed his sentence, Billips's counsel specifically moved "to stay the imposition of the sentence until after a presentence report [could] be considered by the Court along with a set of sentencing guidelines."  In response, the trial judge informed the parties that, *inter alia*, he was going to "order that a presentence report be prepared prior to sentencing."  Asked by the judge if that was "satisfactory," Billips's counsel responded that it was.  The trial judge then set the case for sentencing and ordered that a presentence report be prepared for the court's consideration prior to sentencing.  At the sentencing hearing, the

trial judge admitted the completed presentence report, including the sentencing guidelines report, into evidence. In other words, the trial judge did exactly what Billips requested he do.

It is well settled in Virginia that an appellate court will not "notice error [that] has been invited by the party seeking to take advantage thereof on appeal." Saunders v. Commonwealth, 211 Va. 399, 400, 177 S.E.2d 637, 638 (1970); see also Buchanan v. Commonwealth, 238 Va. 389, 400-01, 384 S.E.2d 757, 764 (1989) (holding that a party may not be heard to complain on appeal where the record shows the lower court took the very action requested or agreed to by that party); Clark v. Commonwealth, 220 Va. 201, 214, 257 S.E.2d 784, 792 (1979) ("The defendant, having agreed upon the action taken by the trial court, should not be allowed to assume an inconsistent position."); McClain v. Commonwealth, 189 Va. 847, 856, 55 S.E.2d 49, 53 (1949) ("The defendant, having taken his chance on a favorable report, ought not to be heard to object later if he considered it unfavorable."). Indeed, "[n]o litigant, even a defendant in a criminal case, will be permitted to approbate and reprobate—to invite error . . . and then to take advantage of the situation created by his own wrong." Fisher v. Commonwealth, 236 Va. 403, 417, 374 S.E.2d 46, 54 (1988). Accordingly, Billips will not now be heard to complain of actions by the trial judge that he himself asked the judge to take.

We hold, therefore, that the trial judge did not err in ordering the preparation of the sentencing guidelines in this case or in considering those guidelines in determining Billips's sentence. See Collins v. Commonwealth, 269 Va. 141, 146, 607 S.E.2d 719, 721 (2005) (noting that "the judgment of the trial court is presumed to be correct unless and until reversed").

IV.  PLETHYSMOGRAPH

Lastly, Billips challenges the admissibility of the results of his penile plethysmograph examination[2] and the opinions based on those results on the ground that the trial judge failed to make a threshold finding that a penile plethysmograph examination is a reliable scientific method of determining a convicted sex offender's risk to reoffend, as required by Spencer v. Commonwealth, 240 Va. 78, 97, 393 S.E.2d 609, 621 (1990).  Absent such a threshold finding, Billips argues, the trial judge erred in receiving and considering the risk assessment portion of the presentence report, which contained those results and opinions.  We disagree.

Decisions regarding the admissibility of evidence presented during sentencing proceedings lie "within the sound discretion of the trial court" and will not be disturbed on appeal absent a clear abuse of discretion.  Runyon v. Commonwealth, 29 Va. App. 573, 576, 513 S.E.2d 872, 874 (1999); see Shifflett v. Commonwealth, 257 Va. 34, 45, 510 S.E.2d 232, 237 (1999) (holding that a trial court's ruling on the admissibility of evidence at sentencing will not be reversed unless the court clearly abused its discretion).  "However, 'by definition, when the trial court makes an error of law, an abuse of discretion occurs.'"  Gonzales v. Commonwealth, 45 Va. App. 375, 380, 611 S.E.2d 616, 618 (2005) (en banc) (quoting Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000)).  "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied . . . ."  Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977).

As we noted in Cotton v. Commonwealth, 19 Va. App. 306, 310, 451 S.E.2d 673, 676 (1994), aff'd on other grounds, 20 Va. App. 596, 459 S.E.2d 527 (1995) (en banc), the Supreme

---

[2] A "plethysmograph" is "an instrument for determining and registering variations in the size of an organ or limb and in the amount of blood present or passing through it."  Webster's Third New International Dictionary 1740 (1993).

Court of Virginia "set forth explicitly the standard for determining the competence of scientific evidence" in Spencer as follows:

> When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis; or unless it is so unreliable that the considerations requiring its exclusion have ripened into rules of law, such as "lie-detector" tests; or unless its admission is regulated by statute, such as blood-alcohol test results.
>
> In making the threshold finding of fact, the court must usually rely on expert testimony. If there is a conflict, and the trial court's finding is supported by credible evidence, it will not be disturbed on appeal. Even where the issue of scientific reliability is disputed, if the court determines that there is a sufficient foundation to warrant admission of the evidence, the court may, in its discretion, admit the evidence with appropriate instructions to the jury to consider the disputed reliability of the evidence in determining its credibility and weight.

Spencer, 240 Va. at 97-98, 393 S.E.2d at 621 (citations omitted).

Spencer and Cotton, however, each involved scientific evidence offered by the Commonwealth during the guilt phase of a jury trial to prove the identity of the criminal agent. Spencer, 240 Va. at 84, 393 S.E.2d at 613; Cotton, 19 Va. App. at 309, 451 S.E.2d at 675. Here, the challenged scientific evidence concerning the penile plethysmograph examination administered to Billips was contained in the risk assessment portion of the presentence report, which was presented to the trial judge at the sentencing hearing pursuant to Code §§ 19.2-299 and 19.2-300. The evidence went explicitly to Billips's risk of reoffending and indirectly to his amenability to treatment, subjects plainly relevant to sentencing. See Merritt v. Commonwealth, 32 Va. App. 506, 508, 528 S.E.2d 743, 744 (2000) ("'The sentencing decision . . . is a quest for a sentence that best effectuates the criminal justice system's goals of deterrence (general and specific), incapacitation, retribution and rehabilitation.'" (quoting United States v. Morris, 837 F. Supp. 726, 729 (E.D. Va. 1993))); Gilliam v. Commonwealth, 21 Va. App. 519, 524, 465

- 15 -

S.E.2d 592, 595 (1996) (noting that evidence bearing on a defendant's "tendency to commit offenses" and "the probabilities of rehabilitation" is "indispensable to the determination of an appropriate sentence" (internal quotation marks omitted)). Billips offers, and we are aware of, no authority requiring a trial judge to apply the evidentiary standard set forth in Spencer to relevant scientific evidence offered in a presentence report pursuant to Code §§ 19.2-299 and 19.2-300. Nor do we perceive a good reason to require a trial judge to do so.

It is well settled in Virginia that the rules governing the admissibility of evidence in sentencing hearings are more relaxed than those applied during the guilt phase of trial. See Harris v. Commonwealth, 26 Va. App. 794, 808, 497 S.E.2d 165, 171 (1998) (noting that the evidentiary restrictions imposed at sentencing hearings are "significantly relaxed"). As the Supreme Court of Virginia said in McClain, 189 Va. 847, 55 S.E.2d 49:

> "Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law."

Id. at 859-60, 55 S.E.2d at 55 (quoting Williams v. People of State of New York, 337 U.S. 241, 246 (1949) (footnote omitted)). This evidentiary distinction between the guilt and penalty phase proceedings exists, the Court explained, because, in the guilt phase of trial, "the rules of evidence are designed to prevent the introduction of collateral issues and to prevent tribunals concerned solely with the issue of guilt of the particular offense from being influenced to convict for that offense by evidence" not strictly admissible on that issue. Id. at 860, 55 S.E.2d at 55. Conversely, at a sentencing hearing, "the task of the judge, within fixed statutory or constitutional limits, is to determine the type and extent of punishment after the issue of guilt has

- 16 -

been determined, to the end that punishment should fit the offender and not merely the crime."

Id.

This distinction is particularly pronounced when it comes to the admissibility of information contained in a presentence report prepared by a probation officer pursuant to Code § 19.2-299. For example, "[a] sentencing judge may consider hearsay contained in a probation report." Thomas v. Commonwealth, 18 Va. App. 656, 659, 446 S.E.2d 469, 471 (1994) (en banc). This is a significant difference from the standard generally applied at trial because, as we said in Evans-Smith v. Commonwealth, 5 Va. App. 188, 197, 361 S.E.2d 436, 441 (1987), "[t]he strongest justification for the exclusion of hearsay evidence is that the trier of fact has no opportunity to view the witness on cross-examination and to observe the demeanor of the out-of-court declarant to determine reliability." Similarly, a sentencing judge may consider a presentence report that contains evidence of the defendant's unadjudicated criminal conduct, Wolfe v. Commonwealth, 37 Va. App. 136, 142-43, 554 S.E.2d 695, 698-99 (2001), including evidence obtained from unnamed confidential informants regarding the defendant's involvement in illicit drug operations, Moses v. Commonwealth, 27 Va. App. 293, 303, 498 S.E.2d 451, 456 (1998).

Justification for this less strict application of the rules of evidence at sentencing hearings is found in Code § 19.2-299(A)'s mandate that the probation officer preparing the presentence report for the trial judge include "the history of the accused . . . and all other relevant facts" in the report "so the court may determine the appropriate sentence to be imposed," and in the established principle that a judge charged with the responsibility of determining the appropriate punishment for a convicted defendant "is entitled to know as much relevant information about the defendant as possible," Beaver v. Commonwealth, 232 Va. 521, 529, 352 S.E.2d 342, 347 (1987) (citing Jurek v. Texas, 428 U.S. 262, 276 (1976) ("What is essential is that the [sentencer]

- 17 -

have before it all possible relevant information about the individual defendant whose fate it must determine.")); see Shifflett, 257 Va. at 43, 510 S.E.2d at 236 (holding that the need for a fully informed sentencer is "no less essential" in cases involving noncapital offenses than it is in cases involving capital offenses).

The relaxed standard of admissibility at sentencing hearings is also reflective of the fact that the sentencing judge alone, and not the jury, receives and considers the presentence report, and any reports included therein, in determining the appropriate sentence to impose. See Harris, 26 Va. App. at 807, 497 S.E.2d at 171 ("Under Code § 19.2-299(A), a probation officer who has been ordered to prepare a presentence report is required 'to fully advise the *court*' of [the relevant information]. The *trial court*, in turn, is required to read and consider the content of the presentence report when 'determining the appropriate sentence to be imposed.'" (citation omitted) (emphasis added)); Code § 19.2-298.01(A) (providing that "the *court* shall (i) have presented to it the appropriate discretionary sentencing guidelines worksheets and (ii) review and consider the suitability of the applicable discretionary sentencing guidelines" and that, "[i]n cases tried by a jury, the jury shall not be presented any information regarding sentencing guidelines" (emphasis added)); Code § 19.2-300 (providing that the sentence will be deferred until the mental examination report "can be secured to guide the *judge* in determining what disposition shall be made of the defendant" (emphasis added)); cf. Code § 19.2-264.4(B) ("In cases of trial by jury, . . . reports under the provisions of § 19.2-299 . . . shall not be admitted into evidence."). As alluded to earlier, it is widely accepted that a sentencing judge, unlike a lay juror, has the ability to disregard evidence in a presentence report that may not properly be relied upon in determining a defendant's sentence. See Beck v. Commonwealth, 253 Va. 373, 385-86, 484 S.E.2d 898, 905-06 (1997) (noting that, unlike a juror, the sentencing judge was able to assess the propriety of the victim impact evidence in the presentence report and disregard any

such evidence that did not warrant his consideration) (citing Eckhart, 222 Va. at 216, 279 S.E.2d at 157); Johnson, 12 Va. App. at 397, 404 S.E.2d at 387 (holding that a sentencing judge, unlike a juror, has the ability to disregard a statement in the presentence report that was not admissible at the sentencing hearing).

> Thus, "'a sentencing judge [may typically] exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed.'" United States v. Torres, 926 F.2d 321, 324 (3d Cir. 1991) (quoting Williams v. New York, 337 U.S. 241, 246 (1949)); see also United States v. Tucker, 404 U.S. 443, 446 (1972) ("[The sentencing] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."). For this reason, the admissibility of evidence during sentencing proceedings does not necessarily turn on whether that same evidence was admissible during the guilt phase of the trial.

Brown v. City of Danville, 44 Va. App. 586, 611, 606 S.E.2d 523, 536 (2004) (alterations in original). However, "[t]his broad rule of inclusion is tempered by the requirement that the information bear some indicia of reliability." Moses, 27 Va. App. at 302, 498 S.E.2d at 456. In other words, the "information relied upon by the court" at a sentencing hearing must "have some indicia of reliability." Alger v. Commonwealth, 19 Va. App. 252, 258, 450 S.E.2d 765, 768 (1994) (citing United States v. Fatico, 579 F.2d 707, 712-13 (2d Cir. 1978)).

These principles also find support, from a constitutional perspective, in the United States Supreme Court's rationale in Barefoot v. Estelle, 463 U.S. 880 (1983). Addressing the question in that case whether potentially unreliable psychiatric evidence about "future dangerousness" was constitutionally admissible at sentencing in a capital murder trial, the Court held that, because it was not "almost entirely unreliable," such "scientific proof" was admissible as long as it was relevant and helpful to the sentencer. Id. at 896-903, 905-06 (citing Jurek, 428 U.S. at 274-76). Eschewing the Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), "general acceptance" standard normally applied in the federal courts at the time to determine the

- 19 -

reliability of scientific evidence,[3] the Court reasoned that the adversary process could "be trusted

to sort out the reliable from the unreliable evidence and opinion . . . , particularly when the

convicted felon has the opportunity to present his own side of the case."  463 U.S. at 901.  As the

Court explained:

> [T]he rules of evidence generally extant at the federal and state
> levels anticipate that relevant, unprivileged evidence should be
> admitted and its weight left to the factfinder, who would have the
> benefit of cross-examination and contrary evidence by the
> opposing party.  Psychiatric testimony predicting dangerousness
> may be countered not only as erroneous in a particular case but
> also as generally so unreliable that it should be ignored.

Id. at 898.  Thus, the Court further explained, the parties' "differences in opinion" as to the

reliability of the scientific evidence, "go to the weight [of the evidence] and not the admissibility

of such [evidence]."  Id. at 902 (first alteration in original) (internal quotation marks omitted).

---

[3] In comparison, Justice Blackmun favorably cited in his dissent several federal cases in which scientific evidence was rejected under the Frye standard.  Id. at 931 n.9, 935 (Blackmun, J., dissenting).  Under the evidentiary standard for scientific evidence set forth in Frye, 293 F. at 1014, expert testimony based on a scientific principle is admissible only if the principle is "sufficiently established to have gained general acceptance in the particular field in which it belongs."  Although the Frye admissibility standard has been superseded by the federal rules of evidence and the reliability-assessment factors propounded in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993), the Supreme Court's constitutional analysis in Barefoot remains valid.  See United States v. Scheffer, 523 U.S. 303, 311 n.7 (1998) (noting that Daubert interpreted and altered the federal rules of evidence, not the Constitution); Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002) (rejecting the appellant's argument that the Supreme Court implicitly overruled Barefoot when it later issued its Daubert standards for the admission of scientific evidence); Flores v. Johnson, 210 F.3d 456, 458 (5th Cir. 2000) (Garza, J., concurring) (acknowledging that Barefoot remained valid and binding on the lower courts); United States v. Sampson, 335 F. Supp. 2d 166, 220 (D. Mass. 2004) (noting that Barefoot addressed the constitutionality of expert testimony while Daubert addressed the admissibility of expert testimony under the federal laws of evidence).

In Virginia, our Supreme Court specifically refused to adopt the Frye standard in O'Dell v. Commonwealth, 234 Va. 672, 696, 364 S.E.2d 491, 504 (1988), and acknowledged in John v. Im, 263 Va. 315, 322, 559 S.E.2d 694, 698 (2002), that it had not "considered the question whether the Daubert analysis employed by the federal courts should be applied in our trial courts to determine the scientific reliability of expert testimony."  Thus, as the Supreme Court noted in John, the Spencer evidentiary standard still governs the admission of scientific evidence in Virginia.  Id. at 322 n.3, 559 S.E.2d at 698 n.3.

As Justice Blackmun pointed out in his dissent in Barefoot, the need for due process could hardly have been any more stringent than it was in that case:

> The Court holds that psychiatric testimony about a defendant's future dangerousness is admissible, despite the fact that such testimony is wrong two times out of three. The Court reaches this result—even in a capital case—because, it is said, the testimony is subject to cross-examination and impeachment. . . . One may accept this in a routine lawsuit for money damages, but when a person's life is at stake—no matter how heinous his offense—a requirement of greater reliability should prevail. In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself.

Id. at 916 (Blackmun, J., dissenting). Justice Blackmun further pointed out that, "[t]o obtain a death sentence in Texas, the State [had] to prove beyond a reasonable doubt that 'there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'" Id. at 916-17 (citing Tex. Code Crim. Proc. Ann. art. 37.071(b)(2) (Vernon 1981)).

In contrast, the instant case is not a death penalty case. See generally Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."). Nor was the Commonwealth required to prove beyond a reasonable doubt Billips's future dangerousness to obtain the sentence imposed in this case. Unlike death penalty cases, the level of punishment imposed in a case like this is not contingent upon a finding of future dangerousness; thus, proof, by any standard, of Billips's risk of reoffending was not essential to imposition of the penalty imposed. See Walker v. Commonwealth, 258 Va. 54, 66, 515 S.E.2d 565, 572 (1999) ("The 'finding' that exposes the defendant to the death penalty is that of future dangerousness, or alternatively, vileness, which by statute must be supported by proof beyond a

- 21 -

reasonable doubt. See Code § 19.2-264.4(C). . . . [Conversely, the Commonwealth] need not

prove beyond a reasonable doubt every fact it recognizes as a circumstance affecting the severity

of punishment."); Washington v. Commonwealth, 46 Va. App. 276, 294, 616 S.E.2d 774, 783

(2005) (en banc) (Humphreys, J., concurring) ("[Generally,] there is no standard of proof during

a sentencing proceeding. Nor does the [sentencer] make any express findings of fact prior to

selecting a sentence from the available range of punishment."), petition for appeal granted, No.

051875 (Va. Sup. Ct. Order of December 14, 2005). Moreover, as previously mentioned, the

scientific evidence challenged in this case was not presented to a jury, but to a judge, who

presumably was able, based on his "training, experience and judicial discipline," Eckhart, 222

Va. at 216, 279 S.E.2d at 157, to ascribe the appropriate weight to the specialists' evidence

without giving undue deference to it.[4] Clearly, then, if reliance on the adversarial process to

assess the reliability of scientific evidence was sufficient to satisfy the due process concerns in

Barefoot, the same must be true in this case, as long as the relevant scientific evidence in dispute

here had some indicia of reliability.

Applying the aforementioned considerations to the specific question before us, we find it

clear that neither due process nor Virginia evidentiary law requires a sentencing judge to make a

threshold finding that relevant scientific evidence offered in a presentence report pursuant to

Code §§ 19.2-299 and 19.2-300 is based on a reliable scientific method. Indeed, all that is

manifestly required is that the evidence have "some indicia of reliability." Alger, 19 Va. App. at

---

[4] Indeed, it is worth noting that the sentencing judge in this case made no mention of the penile plethysmograph in sentencing Billips. Instead, the judge referred solely to the "heinous" nature of the crimes committed and Billips's lack of remorse and empathy for the victims as the bases for the sentences imposed. Thus, although it is impossible to conclude, as the Supreme Court was able to in Saunders v. Commonwealth, 242 Va. 107, 115-16, 406 S.E.2d 39, 44 (1991), that the sentencing judge did not rely at all on the challenged evidence in determining an appropriate sentence, it is clear that the evidence regarding the plethysmograph examination was not of primary concern to the sentencing judge in this case.

- 22 -

258, 450 S.E.2d at 768. We hold, therefore, that, to the extent it required the sentencing judge to do anything more than ensure the plethysmograph evidence had some indicia of reliability before relying thereon, the evidentiary standard set forth in Spencer did not apply.

The question remains, however, whether that evidence bore the requisite indicia of reliability to permit the sentencing judge to receive and consider it at the sentencing hearing. To make that determination, we must examine the circumstances surrounding the challenged evidence. See Wolfe, 37 Va. App. at 142-43, 554 S.E.2d at 698-99.

Charged with the responsibility of determining an appropriate sentence for Billips, the trial judge ordered the preparation of a presentence report under Code § 19.2-299(A) and a psychosexual evaluation under Code § 19.2-300. The probation officer responsible for preparing the presentence report referred Billips to a corporation specializing in the "assessment and treatment of sexual offenders" for evaluation. As part of that evaluation, Billips underwent a penile plethysmograph examination. The risk assessment report prepared by the two specialists who examined Billips stated that a "Penile Plethysmograph Assessment evaluates the presence or absence of deviant sexual arousal. Research has demonstrated that deviant sexual arousal is one of the best indicators of risk to sexually reoffend." The report further stated that "Mr. Billips'[s] response pattern represents elevated responses to three or more categories across gender[, which] places Mr. Billips in the highest reoffense risk category. Deviant arousal to children has been shown to be the strongest indicator of recidivism." Relying on the plethysmograph results and numerous other sources of information, circumstances, and factors, the specialists who prepared the risk assessment report determined that Billips posed a moderate risk to sexually reoffend.

Billips argued at the sentencing hearing that penile plethysmograph examinations are as unreliable as polygraph examinations.[5] However, despite having had ample opportunity to do so, he offered no evidence to support that claim or to counter the implicit declaration in the risk assessment report that a penile plethysmograph examination is a reliable method of determining a sex offender's risk of reoffending. Nor did he offer any evidence to show that the particular results of the plethysmograph examination administered to him were unreliable indicators of his risk to reoffend. Indeed, Billips's claims of unreliability are wholly unsupported in the record.

Upon these circumstances, we conclude that the information in the risk assessment report concerning Billips's penile plethysmograph examination had the requisite indicia of reliability to permit the sentencing judge to receive and consider that information at the sentencing hearing.

Accordingly, we cannot say the trial judge abused his discretion in admitting the risk assessment portion of the presentence report without making a threshold finding that a penile

---

[5] Addressing the reliability of polygraph examinations, in Robinson v. Commonwealth, 231 Va. 142, 341 S.E.2d 159 (1986), our Supreme Court stated:

> In a long line of cases, spanning almost thirty years, we have made clear that polygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use whether they favor the accused, implicate the accused, or are agreed to by both parties. The point of these cases is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.

Id. at 156, 341 S.E.2d at 167 (citations omitted). Addressing the same subject in Scheffer, 523 U.S. at 312, the United States Supreme Court stated that, "[a]lthough the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." Neither Court, however, has addressed the subject of the reliability of plethysmograph examinations. Given the paucity of evidence on that subject in the present record, we leave for another day the question whether, in the context of this case, a penile plethysmograph examination is trustworthy enough in general to be "considered or treated as a reliable scientific technique," Satcher v. Commonwealth, 244 Va. 220, 242, 421 S.E.2d 821, 834 (1992), or "so thoroughly unreliable as to be of no proper evidentiary use," Robinson, 231 Va. at 156, 341 S.E.2d at 167. The cases cited by the dissent— which involve procedural postures, evidentiary circumstances, and admissibility standards inapposite to the present case—do not persuade us to do otherwise.

plethysmograph examination is a reliable scientific method of determining a convicted sex offender's risk to reoffend.

## V. CONCLUSION

For these reasons, we affirm Billips's sentences.

<u>Affirmed.</u>

Benton, J., concurring, in part, and dissenting, in part.

I concur with the majority's holding regarding the first two issues raised on appeal. I dissent, however, from the holding on the third issue because I believe that plethysmographs are as unreliable as polygraphs. I would hold that the trial judge erred by permitting plethysmograph results into evidence as a factor in assessing punishment upon Matthew Edward Billips. Therefore, I would reverse the sentences and remand for re-sentencing.

"Generally, when a specific objection is made to evidence or when inquiry is made by the trial judge concerning the purpose of evidence, the proponent of the evidence has the burden of establishing its admissibility." Neal v. Commonwealth, 15 Va. App. 416, 420, 425 S.E.2d 521, 523 (1992) (citing 1 Wigmore On Evidence §§ 14.1, 17, and 18 (Tillers rev. 1983)). Indeed, the Supreme Court of Virginia repeatedly has predicated the trial judge's admission of scientific evidence upon the proponent of the evidence establishing its reliability. See Spencer v. Commonwealth, 238 Va. 275, 290, 384 S.E.2d 775, 783 (1989) (ruling that DNA testing was admissible because evidence established the scientific technique's reliability); O'Dell v. Commonwealth, 234 Va. 672, 695-97, 364 S.E.2d 491, 504-05 (1988) (ruling that electrophoresis blood testing was admissible because it was reliable and generally accepted in the field of forensic science); Lee v. Commonwealth, 200 Va. 233, 237, 105 S.E.2d 152, 155 (1958) (holding that lie detector test results were inadmissible because such tests generally have not been proved scientifically reliable).

The Commonwealth failed to establish that the plethysmograph is reliable as a measure of the responses it purports to test -- sexual preference and behavior. Like the polygraph, it purports to be an accurate measure of a psychological state as indicated by physiological responses. In view of the polygraph's unreliability, Virginia bars polygraph evidence from court

proceedings.[6]  See Robinson v. Commonwealth, 231 Va. 142, 156, 341 S.E.2d 159, 167 (1986)

(holding that the trial judge properly excluded polygraph results to be used for impeachment

purposes).  In doing so, the Supreme Court of Virginia held as follows:

> In a long line of cases . . . we have made clear that polygraph
> examinations are so thoroughly unreliable as to be of no proper
> evidentiary use whether they favor the accused, implicate the
> accused, or are agreed to by both parties.  The point of these cases
> is that the lie-detector or polygraph has an aura of authority while
> being wholly unreliable.

Id. (citations omitted); see also Odum v. Commonwealth, 225 Va. 123, 132, 301 S.E.2d 145, 150

(1983) (holding that polygraph results are inadmissible "in any hearing relating to the

prosecution of defendant" even though parties stipulated the results could be introduced).  "The

rule [barring evidence of polygraph results] is so firmly embedded in our law that even

'[e]vidence of a person's willingness or unwillingness to submit to a polygraph examination is

inadmissible.'"  Crumpton v. Commonwealth, 9 Va. App. 131, 135-36, 384 S.E.2d 339, 342

(1989) (quoting Gray v. Graham, 231 Va. 1, 10, 341 S.E.2d 153, 158 (1986)); see also Taylor v.

Commonwealth, 3 Va. App. 59, 62, 348 S.E.2d 36, 37 (1986) (holding an unreliable test cannot

_____

[6] After decades of debate, the scientific community still has not agreed on the reliability
of polygraphs, despite numerous studies on the question.  See United States v. Scheffer, 523 U.S.
303, 309 (1998); see also 4 David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph
Sanders, Modern Scientific Evidence §§ 40:20 to 40:118, at 571-655 (2005) (discussing and
analyzing the two sides of the continuing polygraph debate in the scientific community).  While
some studies concluded that polygraphs are highly accurate, others reported 50 and 51%
accuracy rates.  See Scheffer, 523 U.S. at 309 (citing S. Abrams, The Complete Polygraph
Handbook 190-91 (1989); William G. Iacono & David T. Lykken, The Scientific Status of
Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific
Evidence § 14-5.3 (1997)); see also 1 John W. Strong, McCormick on Evidence § 206, at 629
(5th ed. 1999) (summarizing the results of various studies conducted on polygraph reliability).
One of the serious, lingering concerns about polygraphs is that an individual can "trick" the
machine and receive a negative result despite lying.  See Strong, supra (explaining the concern
that "'coaching' and practicing would become more commonplace if the evidence were generally
admissible").  "Although the degree of reliability of polygraph evidence may depend upon a
variety of identifiable factors, there is simply no way to know in a particular case whether a
polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague
even the best polygraph exams."  Scheffer, 523 U.S. at 312.

yield definite and conclusive results, and therefore polygraph results are inadmissible even under an agreement by the parties that the results will be admissible if not shown to be indefinite or inconclusive).

Relying on "'a long line of cases,'" from the Supreme Court "'spanning almost thirty years,'" we have held that polygraph results are not admissible even during revocation proceedings, where the evidentiary standard is lessened. White v. Commonwealth, 41 Va. App. 191, 194, 583 S.E.2d 771, 772-73 (2003) (quoting Robinson, 231 Va. at 156, 341 S.E.2d at 167)). Indeed, Virginia law does not distinguish between different phases of trial when considering the admissibility of polygraphs. That is so because "[a]n unreliable test cannot determine the truth; that determination is properly left to the judge or jury as the fact finder." Crumpton, 9 Va. App. at 136, 384 S.E.2d at 342.

The use of plethysmographs implicates these same concerns. Plethysmographs are a phallometric test conducted by placing a metal gauge over the subject's penis that measures variations in the penis's size. During the session, the subject is exposed to a variety of visual and audio sexual depictions of males and females of different ages, in both consenting and non-consenting situations. The theory behind the plethysmograph is that it directly measures erotic response to the different stimuli, indicating what the subject finds sexually exciting. See Judith V. Becker & William D. Murphy, Sex Offenders: Scientific, Legal, and Policy Perspective: The Science of Sex Offenders: Risk Assessment, Treatment, and Prevention: What We Know and Do Not Know About Assessing and Treating Sex Offenders, 4 Psych. Pub. Pol. & L. 116, 122 (Mar./June 1998).

In United States v. Powers, 59 F.3d 1460, 1471 (4th Cir. 1995), the court noted that "the scientific literature addressing penile plethysmography does not regard the test as a valid diagnostic tool because, although useful for treatment of sex offenders, it has no accepted

standards in the scientific community." See also Berthiaume v. Clark, 142 F.3d 12, 14-15 (1st Cir. 1998) (examining the apparent scientific debate over the usefulness of plethysmographs). In North Carolina v. Spencer, 459 S.E.2d 812, 815 (N.C. Ct. App. 1995), the government's expert explained that although the plethysmograph accurately measures the increase of blood to the penis, there was "substantial disagreement" over whether the physical reaction directly correlates to sexual behavior. The North Carolina Court of Appeals rejected the use of the plethysmograph, noting that "there is a substantial difference of opinion within the scientific community regarding the plethysmograph's reliability to measure sexual deviancy." Id. (citing e.g., James G. Barker & Robert J. Howell, The Plethysmograph: A Review of Recent Literature, 20 Bull. Am. Acad. of Psychiatry & L. 13 (Mar. 1992) (identifying several problems with the reliability of the plethysmograph, namely "lack of standards for training and interpretation of data, lack of norms and standardization and susceptibility of the data to false negatives and false positives," and concluding that "despite the sophistication of the current equipment technology, a question remains whether the information emitted is a valid and reliable means of assessing sexual preference")).

An expert testified in another case that "the penile plethysmograph, though it can be helpful in treating sexual deviance, is not a reliable means of assessing sexual deviance." Nelson v. Jones, 781 P.2d 964, 969 (Alaska 1989); see also Berthiaume, 142 F.3d at 14-15 (where the expert testified that plethysmographs are "not useful to identify pedophilia because the test has a high rate of false negatives"); Cooke v. Naylor, 573 S.2d 376, 379 (Me. 1990) (upholding the rejection of the plethysmograph where "experts testified that these tests are of questionable reliability even in establishing a correct pedophilic or non-pedophilic profile for the individual undergoing evaluation"). Another expert criticized plethysmographs because they have "not gained acceptance by the scientific community as a reliable predictor of future behavior."

Dutchess County Dep't of Soc. Servs. v. G., 534 N.Y.S.2d 64, 69 (N.Y. Fam. Ct. 1988); see also Gentry v. Georgia, 443 S.E.2d 667, 669 (Ga. Ct. App. 1994) (holding that the plethysmograph was inadmissible in Georgia because the reliability of the method had not been established and because of the uncertainty of its reliability within the scientific community).

Skepticism over the plethysmograph is understandable. One study reported that "only 50% of child molesters display deviant arousal patterns on the test," and another found that "a large percentage of non-sex offenders display some degree of arousal to stimuli involving young children." Jason R. Odeshoo, Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders, 14 Temp. Pol. & Civ. Rts. L. Rev. 1, 11-12 (Fall 2004). An additional concern about the plethysmograph's reliability and accuracy is that the subject can manipulate the results. See In the Interest of A.V., 849 S.W.2d 393, 399 (Tx. App. 1993) (the expert attempting to validate the method "admitted that a person of high intelligence . . . can easily manipulate the results"); see also United States v. Birdsbill, 243 F. Supp. 2d 1128, 1133 (D. Mont. 2003) (briefly reviewing expert testimony about the susceptibility of plethysmographs to "faking"); North Carolina v. Spencer, 459 S.E.2d at 815 (noting that a study indicates penile response is subject to voluntary control). Some subjects can exhibit responses to non-preferred stimuli as well as reduce response to preferred stimuli. Grant T. Harris, Marnie E. Rice, & Vernon L. Quinsey, Sex Offenders: Scientific, Legal and Policy Perspective: The Science of Sex Offenders: Risk Assessment, Treatment, and Prevention: Appraisal and Management of Risk in Sexual Aggressors: Implications for Criminal Justice Policy, 4 Psych. Pub. Pol. & L. 73, 79 (Mar./June 1998).[7]

_____

[7] As with polygraphs, the debate has proponents of the use of plethysmographs. See North Carolina v. Spencer, 459 S.E.2d at 815 (referencing a study reporting 95% accuracy); Dutchess County Dep't of Soc. Servs., 534 N.Y.S.2d at 68 (where a study reported 85 to 90% accuracy); see also Micheal C. Seto, Grant T. Harris, Marnie E. Rice, & Howard E. Barbaree, The Screening Scale for Pedophilic Interests Predicts Recidivism Among Adult Sex Offenders

In sum, the available data about plethysmographs reveals a scientific community dramatically divided over their reliability and accuracy. The studies of plethysmographs vary drastically in their conclusions. Some reports show an extremely fallible method, susceptible to manipulation from the subject and often misidentifying the subject as a sex-offender or as a non-offender, while other studies report high accuracy rates. In this respect, plethysmographs and polygraphs, both of which measure physiological responses, are similar. Both require an *assumption* that the physiological response measured directly reflects the emotion and behavior purportedly being measured.

For these reasons, I believe that plethysmographs, like polygraphs, "are so thoroughly unreliable as to be of no proper evidentiary use." See Robinson, 231 Va. at 156, 341 S.E.2d at 167. Like polygraphs, the plethysmograph "has an aura of authority while being wholly unreliable." Id. It is well established that reliability of evidence offered in a criminal proceeding is a due process concern. See Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (holding that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations"). Therefore, I would hold that the trial judge erred by allowing the plethysmograph results into evidence when determining the punishment to assess upon Billips, and I would reverse and remand for re-sentencing upon proper evidence.

With Child Victims, 33 Archives of Sexual Behav. 455 (2004) (stating that phallometric testing consistently detects sex offenders).